Honorable Ronald V. DELLUMS et al.

v.

James M. POWELL, Chief, U. S.
Capitol Police, et al.

Appeal of Richard NIXON.

In re SUBPOENA TO COMPEL DISCLO-
SURE OF RECORDED PRESIDEN-
TIAL CONVERSATIONS.

No. 76–1336.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 27, 1976.

Decided Jan. 28, 1977.

Rehearing Denied April 14, 1977.

Certiorari Denied Oct. 3, 1977.
See 98 S.Ct. 234.

R. Stan Mortenson, Washington, D. C., with whom Herbert J. Miller, Jr. and Raymond G. Larroca, Washington, D. C., were on the brief for appellant.

Warren K. Kaplan, Washington, D. C., with whom Lawrence H. Mirel, Washington, D. C., were on the brief for appellees.

David J. Anderson, Washington, D. C., with whom Rex. E. Lee, Asst. Atty. Gen., and Irwin Goldbloom, Deputy Asst. Atty. Gen., Washington, D. C., were on the brief for appellee Buchen.

Before LEVENTHAL, ROBINSON and MacKINNON, Circuit Judges.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

LEVENTHAL, Circuit Judge:

This appeal concerns the validity of an order of the District Court for the District of Columbia (Judge William Bryant) denying the motion of appellant, former Presi-

dent Richard M. Nixon, to quash a subpoena *duces tecum* served on Philip Buchen, Counsel to President Ford by plaintiffs-appellees.[1] The challenged subpoena demands production of "all tapes and transcripts of White House conversations during the period of April 16 through May 10, 1971, at which 'May Day' demonstrations . . . were discussed." App. 25a. Plaintiffs seek this material in connection with their civil action in District Court for damages ascribed to alleged violations of their constitutional rights.[2] The underlying facts refer to the arrest of plaintiffs and their class on the grounds of the Capitol on May 5, 1971, and their subsequent detention, during the "May Day" demonstrations held to protest American military involvement in Southeast Asia.[3] The class action has already gone to trial as against all defendants other than former Attorney General John Mitchell, and the judgment of the District Court (also Judge Bryant) awarding damages to plaintiffs has been appealed.[4] The challenged subpoena is presently designed to obtain information for use only in the action remaining against Mr. Mitchell, whose case was severed on his motion.

The subpoena was originally served by plaintiffs in October, 1974. Mr. Buchen, the person who has actual physical control over Mr. Nixon's "White House tapes," [5] filed a motion to quash the subpoena on the ground that he was not the custodian of the tapes, and alternatively that the material sought was not relevant to the case. The District Court denied Mr. Buchen's motion on November 14, 1974, and ordered him to produce the subpoenaed material. Shortly thereafter, counsel for Mr. Nixon learned of the production order and immediately filed a motion for stay of the November 14 order. He also filed his own motion to quash the subpoena, in which he asserted that the materials sought in the subpoena were subject to the presidential privilege of confidentiality recognized by the Supreme Court in *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), and that this privilege was absolute in the context of civil litigation. On December 2, 1974, the same date the District Court ordered severance as to Mr. Mitchell, it granted Mr. Nixon's motion for stay, without ruling on his motion to quash.[6] The action against all

1. The named plaintiffs-appellees, representing themselves and a class of approximately 1,200 individuals, are Congressman Ronald V. Dellums, Bruce Aldrich, Edward J. Cannon, Frederick J. Deterle, Janis L. McDonald, LaDuska Monaco, David L. Preiss, Gary M. Regan, Michael J. Roche, and Dorothy Strong.

2. Plaintiffs-appellees essentially charged that defendants deprived them of liberty without due process of law in violation of the Fifth Amendment, and infringed their rights to freedom of assembly, freedom of speech and freedom to petition the government for redress of grievances in violation of the First Amendment. Brief of Appellees at 26.

3. The factual setting of the May Day demonstrations is set forth in *Sullivan v. Murphy,* 156 U.S.App.D.C. 28, 478 F.2d 938, *cert. denied,* 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973).

4. Mr. Mitchell was originally made a codefendant with the District of Columbia, the former Chief of the Capitol Police, the former Chief of the Metropolitan Police Department, and Mr. Richard Kleindienst. Mr. Mitchell was granted a severance on December 2, 1974, because of his involvement with other judicial proceedings. The remaining defendants went to trial and plaintiffs were awarded damages of twelve

million dollars from the District of Columbia and the two former police chiefs; Mr. Kleindienst was granted a directed verdict because of insufficient evidence. Those judgments are currently on appeal before this Court. *Dellums, et al. v. Powell, et al.,* Nos. 75–1974, 75–1975, and 75–2117. Mr. Nixon has never been a defendant in the suit.

5. This claim was based on the fact that Mr. Nixon's Presidential materials were at that time the subject of a depository Agreement—the so-called Nixon-Sampson Agreement—under which Mr. Nixon was recognized as the lawful custodian. That agreement has since been superceded by the Presidential Recordings and Materials Preservation Act, Pub.L. 93–526 (Dec. 19, 1974), 88 Stat. 1695, 44 U.S.C.A. §§ 2107 note, 3315–24 (Supp. I, Feb. 1975), which has recently been upheld as constitutional, *Richard M. Nixon v. Administrator of General Services, et al.,* 408 F.Supp. 321 (D.D.C. 1976) (three-judge court), *prob. juris. noted,* 429 U.S. 976, 97 S.Ct. 483, 50 L.Ed.2d 583 (1976).

6. The motion for stay was granted "[b]ecause of the pendency of the trial and the prospect that lengthy litigation would be necessary to

but Mr. Mitchell proceeded to judgment without further material reference to the subpoena.

The subpoena thereafter remained in limbo until plaintiffs began making preparation to proceed with their action against Mr. Mitchell. On February 17, 1976, they filed a supplemental memorandum in opposition to Mr. Nixon's motion to quash. He filed a responsive supplemental memorandum. The District Court, on March 10, 1976, issued a Memorandum and Order denying the motion to quash, vacating the stay order of December 2, 1974, and directing Mr. Buchen to advise the Court of the time necessary for compliance with the subpoena. This court has stayed the District Court's order pending consideration of its validity.[7]

In denying this motion to quash, the District Court assumed *arguendo* that a former President could assert a presidential privilege based on a generalized interest in confidentiality, but held that it was not an absolute privilege in the context of civil litigation and that it was entitled to a lesser weight than a claim of presidential privilege asserted by an incumbent President. The court found that the privilege had been overcome in this case, and that Mr. Nixon's Fourth Amendment privacy rights would not be infringed by a search of the materials by Mr. Buchen.

These holdings are vigorously challenged on appeal. Mr. Nixon asserts that the privilege must be absolute when asserted in civil litigation, and that a formal claim of privilege is entitled to the same weight whether asserted by a former or an incumbent President. He additionally urges that the District Court erred in holding that his privacy claim was frivolous.

We reverse the District Court, in part, and remand the case with instructions intended to give further protection to Mr. Nixon's interest in the privacy of his personal documents and communications. As to the claim of presidential privilege, however, with the interest of personal privacy put to one side, we affirm the District Court's ruling. That ruling was based on the inaction of Gerald Ford, President when the District Court made its ruling, and when this opinion was sent to press. If a different approach by Jimmy Carter, as President, should develop, this would be a basis for counsel to seek reconsideration by the District Court.

## I.

■ This case does not require us to rule on the issue of law whether a former President has the requisite interest to assert a presidential confidentiality privilege.[8] Assuming *arguendo* a former President may present a claim of presidential privilege, we agree with the District Court both that it is entitled to lesser weight than that assigned the privilege asserted by an incumbent President, and that it has been overcome in the present case by plaintiffs' showing.

■ We begin our discussion by rejecting Mr. Nixon's contention that a formal claim of privilege based on the generalized interest of presidential confidentiality, without more, works an absolute bar to discovery of presidential conversations in

---

enforce the subpoena of the tapes * * *." App. 15–A. The suit against Mr. Mitchell was served on the same date.

7. After its denial of the motion to quash the District Court denied a motion for stay pending appeal. Mr. Nixon immediately appealed and filed a motion for stay. This Court granted an "administrative stay" so that it could more fully consider the matter on oral argument of the motion. At oral argument, the parties agreed to submit the case on the merits and to file briefs subsequent to the argument. The stay has remained in effect pending further order of the court.

8. We attach no significance to the distinction appellant attempts to draw between a claim of "executive privilege" and one of "presidential privilege." Appellant asserts that the former refers to the privilege relating to the protection of secret information involving military and foreign affairs and national security, while the latter covers the interest in safeguarding the confidentiality of confidential communications unrelated to subject matter. Such semantic distinctions are not significant, nor are they relevant.

civil litigation, regardless of the relevancy or necessity of the information sought. It is the province and duty of the judiciary "to say what the law is" with respect to the claim of privilege in a particular case, even when the claim is one of presidential privilege. *Marbury v. Madison,* 1 Cranch 137, 177, 2 L.Ed. 60 (1803); *United States v. Nixon,* 418 U.S. 683, 705, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). The privilege asserted in the case at bar is not premised on a claim of a need to protect national security, military or diplomatic secrets;[9] it is, rather, premised on the needs of present and future Presidents to maintain the confidentiality of communications with their advisors in order to encourage the candid advice necessary for effective decisionmaking. The privilege rooted in confidential communications with the President is constitutionally based, and entitled to great weight, *United States v. Nixon, supra,* but it has been consistently viewed as presumptive only. *See, e. g., Id.* at 708, 94 S.Ct. 3090; *Senate Select Committee v. Nixon,* 162 U.S. App.D.C. 183, 188, 498 F.2d 725, 730 (1974) (en banc); *Nixon v. Sirica,* 159 U.S.App. D.C. 58, 75, 487 F.2d 700, 717 (1973) (en banc); *Committee for Nuclear Responsibility, Inc. v. Seaborg,* 149 U.S.App.D.C. 385, 463 F.2d 788, *cert. denied,* 404 U.S. 917, 92 S.Ct. 242, 30 L.Ed.2d 191 (1971); *Sun Oil Co. v. United States,* 514 F.2d 1020 (Ct.Cl. 1975); *Nixon v. Administrator of General Services, et al.,* 408 F.Supp. 321 (D.D.C. 1976) (three judge court), *prob. juris. noted,* 429 U.S. 976, 97 S.Ct. 483, 50 L.Ed.2d 583 (1976); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318 (D.D.C.1966), *aff'd* 128 U.S.App.D.C. 10, 384 F.2d 979, *cert. denied,* 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967). The various decisions

considering the privilege reflect a balancing approach, weighing "the detrimental effects of disclosure against the necessity for production shown," *Carl Zeiss Stiftung, supra,* 40 F.R.D. at 327. In Judge McGowan's phrase, there is a "need for particularized analysis rather than [the] mechanistic formalism" inherent in a claim of executive absolutism. *Nixon v. Administrator, supra,* 408 F.Supp. at 342; *see also Nixon v. Sirica, supra,* 159 U.S.App.D.C. at 73, 487 F.2d at 715.

The question before us was left open in *United States v. Nixon,* for in that case, as the Court noted, it had no occasion to consider the "need for relevant evidence in civil litigation."[10] Mr. Nixon argued that the recognition for civil litigation of a presidential privilege that is not conclusive, but only "presumptive," would effectively destroy the privilege. It is urged that recognition of a rebuttable presumption would open the floodgates: those on whom a President relies for advice would be foolish indeed to discuss the demands of executive decisionmaking with candor, when every proposal would be subject to public disclosure through civil discovery.

An advisor to the President has no guarantee of confidentiality. His advice may be disclosed by the President[11] or a successor. As to disclosure by a court, the need for confidentiality is in large measure secured and protected by the relatively infrequent occasions when an assertion of the privilege may be overcome.[12] And so it is, and should be, that the "presumptive" privilege embodies a strong presumption, and not merely a lip-service reference.

**9.** *See United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953).

**10.** In *United States v. Nixon, supra,* 418 U.S. at 712, n. 19, 94 S.Ct. at 3109, n. 19, the Court noted:

We are not here concerned with the balance between the President's generalized interest in confidentiality and the need for relevant evidence in civil litigation, nor with that between the confidentiality interest and congressional demands for information, nor with

the President's interest in preserving state secrets. We address only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in criminal trials.

**11.** *See, e. g.,* 10 Weekly Comp. of Pres. Docs. 449–450–58 (May 6, 1974).

**12.** The interest in preserving confidentiality is weighty indeed and entitled to great re-

Appellant's counsel stresses that in the 1974 *Nixon* case the court referred to the constitutional demands of the criminal justice system as identifying a need for disclosure. That is so. But there is also a strong constitutional value in the need for disclosure in order to provide the kind of enforcement of constitutional rights that is presented by a civil action for damages, at least where, as here, the action is tantamount to a charge of civil conspiracy among high officers of government to deny a class of citizens their constitutional rights and where there has been sufficient evidentiary substantiation to avoid the inference that the demand reflects mere harassment. *Cf. Apton v. Wilson,* 165 U.S.App.D.C. 22, 506 F.2d 83 (1974). The possibility of disclosure in such instances is not unlike the possibility of disclosure in criminal cases—the infrequent occasions of such disclosure militate against any substantial fear that the candor of Presidential advisers will be imperiled.

■ It is of cardinal significance, in the controversy now before this court, that the claim of privilege is being urged solely by a former president, and there has been no assertion of privilege by an incumbent president, whose appearance had a distinctly different stance.[13] Absence of support from the incumbent at least indicates that "the risk of impairing necessary confidentiality is attenuated." *Nixon v. Administrator, supra,* 408 F.Supp. at 344. The language of the 1974 *Nixon* opinion suggests an underlying assumption of a sitting rather than a former president, as witness the reference to the need for "according high respect to the representations made on behalf of the President" (418 U.S. at 707, 94 S.Ct. at 3107), and the quotation from Chief

Justice Marshall's opinion in *Burr,* that "in no case of this kind would a court be required to proceed against the president as against an ordinary individual." We concur in the analysis of Judge McGowan, in *Nixon v. Administrator, supra,* 408 F.Supp. at 344–45:

> [E]ven assuming *arguendo* that Mr. Nixon may, as a former President, assert executive privilege, such a claim is not as forceful as one raised by an incumbent. All of the reasons militating against permitting a former President to assert privilege without the support of the incumbent suggest, at the least, that if he is to be allowed to do so, such a claim carries much less weight than a claim asserted by the incumbent himself.[14]

■ To aid analysis of presidential privilege, any interests of personal privacy may be put to one side, although their presence is the occasion for providing some additional protection in the screening procedure, as appears in part III of our opinion. On a transfer of information and documents material to the carrying on of presidential functions, it is the new President who has the information and attendant duty of executing the laws in the light of current facts and circumstances, and who has the primary, if not the exclusive, responsibility of deciding when presidential privilege must be claimed, when in his opinion the need of maintaining confidentiality in communications, in which of course it is he who has the on-going interest, outweighs whatever public interest or need may reside in disclosure. There is a presumptive privilege that attaches to the communications, submissions and deliberations essential to the conduct of the office of the president.

---

spect. However, we cannot conclude that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution. *United States v. Nixon, supra,* 418 U.S. at 712, 94 S.Ct. at 3109.

13. When the Counsel to President Ford attempted to quash the subpoena no claim of privilege was asserted. Rather, he claimed

that the subpoena should not be directed to him, and alternatively urged simply that the requested materials were *not relevant* to the litigation.

14. The reasons "militating against" a former President being allowed to assert the privilege relate principally to the fact that the privilege is seen as inhering in the institution of the Presidency, and not in the President personally. The reasons are extensively discussed in *Nixon v. Administrator, supra,* 408 F.Supp. at 343–45.

Obviously, the privilege does not disappear merely because the president who made or received the communication dies, resigns, or has completed his term. The question is, by whom must the privilege be claimed. Analytically, there is much to be said for the proposition that the state secret privilege must be claimed by some official authorized to speak for the state (the government), and the presidential privilege must be claimed by the president or an official authorized to speak for the president. As already noted, however, it is not necessary for us to decide that issue in this case. Assuming it may be asserted by someone other than the sitting president, conceivably by the court itself, the *significance* of the assertion by a former president is diminished when the succeeding president does not assert that the document is of the kind whose nondisclosure is necessary to the protection of the presidential office and its ongoing operation. The former president's assertion has a cast of history—at first recent history, and ultimately mere history—and his claim has less significance as an assertion of the current needs of the office. Such lesser significance does not open the door to public disclosure, but only to consideration whether the claim is overcome by a showing of other need, here litigating need.

## II.

■ The District Court here found that plaintiffs-appellees had made a showing of need sufficient to overcome the claim of presidential privilege. This was not a rote, conclusory or perfunctory finding. The court presented the basis for its finding in a considered analysis:

The Court believes plaintiffs have demonstrated a very strong entitlement to discovery of the tapes in question. Plaintiffs claim that a policy or plan was devised by the defendants in this case, including defendant Mitchell, which led to and instigated the allegedly unlawful arrest and detention of plaintiffs on May 5, 1971. Other discovery has established that high-level meetings were held at the Justice Department to plan for the May

Day demonstrations. Defendant Mitchell, according to deposition testimony, was briefed on these meetings. At least one top-level White House aide was present at each of these meetings after April 16, the initial date with which the subpoena is concerned. The almost certain inference must be that these aides reported to Nixon on the progress of their planning, and took his reactions and directions back to the Justice Department. It is quite possible, as plaintiffs suggest, especially given the close relationship between Nixon and Mitchell, that the two men discussed the matter either personally or by telephone. If so, the conversations will be among those subpoenaed. And whatever recorded conversations occurred in the White House with regard to the Administration's plans for dealing with the demonstrators could constitute the most direct and central sort of evidence for plaintiffs' case. The Court can scarcely imagine what could be more relevant to the grave allegations in the present case than the actual words of those alleged to have been the conspirators. Nor can the Court perceive any alternative means by which plaintiffs could obtain comparable discovery. They have had considerable difficulty, in particular, in arranging to depose Mitchell, and even should they do so the results are bound to be far inferior to the actual contemporaneous record of the planning for the demonstrations. In short, the showing made by plaintiffs completely overcomes whatever presumptive executive privilege may attach to the former President's interest in the tapes. App. 18–A—19–A.

We affirm the District Court ruling. Concededly, plaintiffs-appellees have not established with absolute certainty that conversations concerning the demonstrations actually took place between Mr. Nixon and those with whom he consulted during the time frame embraced by the subpoena. It is enough for present purposes that it is highly likely that such conversations did take place and were recorded, and there is a substantial possibility that Mr. Nixon dis-

cussed the matter with Mr. Mitchell, who was both his attorney general and a person who enjoyed a close working relationship with the President. Only if such recorded conversations do exist, will plaintiffs have access to any record. If they do not exist, the assumed privilege will remain intact and there will be no public disclosure.

We are also in accord with the ruling of the District Court that plaintiffs-appellees established a specific need for the requested information sufficient to overcome the rebuttable presumption of privilege of a former President, assuming such a privilege exists. Their need is beyond the routine desire of every party to discover relevant information to assist in the preparation of a case. The District Judge was acting on the premise that the lengthy trial held before him as to the other defendants established that the Department of Justice played a leading role in the executive's efforts to cope with the May Day demonstrations, and that there had ensued substantial violations of fundamental constitutional rights on May 5, 1971. What had not yet been established was whether, or to what extent, former Attorney General Mitchell was involved in the particular constitutional violations of May 5, 1971. Given the substantial violations of constitutional rights sought to be vindicated, given the high-level meeting at the Justice Department to prepare for the May Day demonstration, the attendance of a White House aide and briefing of Mr. Mitchell as attorney general on these matters, plaintiffs have made a showing of substantial need, in their attempt to establish Mr. Mitchell's responsibility for the violations, for overcoming the presumption of the privilege assumed to exist for former Presidents. *Cf. Sun Oil Co. v. United States, supra,* 514 F.2d at 1025.

In sum, plaintiffs-appellees have certainly made at least a "preliminary showing of necessity"[15] for information that is not merely "demonstrably relevant"[16] but indeed substantially material to their case.[17]

To obviate any misunderstanding, and in view of the importance of the considerations involved, we add a word concerning protective orders, even though not specified in appellant's papers. Disclosure because of the potential needs of litigation need not be made to the public, and indeed in a case of this kind should be restricted to counsel, unless and until the documents are made part of the public trial record. *E. g.,* 4 J. Moore, *Moore's Federal Practice* ¶ 26.-73–75 (1976). Former President Nixon would be entitled to a protective order, that before any documents are disclosed in a public proceeding or record there would be due and ample notice to Mr. Nixon, and an opportunity to litigate the issue of need for public disclosure, on a determination to be made in the light of the actual litigating posture of the case and the contents of the document(s). Our affirmance of the district court's order on this aspect of the case is to be taken as without prejudice to any request for or claim of right to a suitable protective order.

### III.

We find, however, that the District Court erred in failing to provide adequate protection for Mr. Nixon's personal privacy interests in the materials subpoenaed.

The court directed Counsel to the President to review the designated tape recordings to determine if conversations pertaining to May Day demonstrations were included therein, and thereafter to turn over such recordings directly to counsel for plaintiffs. Mr. Nixon claims initially that the subpoena amounts to nothing more than a wide-ranging "fishing expedition" de-

---

15. *Smith v. Schlesinger,* 168 U.S.App.D.C. 204, 219 & n. 52, 513 F.2d 462, 477 & n. 52 (1975).

16. *United States v. Nixon, supra,* 418 U.S. at 712, 94 S.Ct. 3090.

17. *Compare Apton v. Wilson,* Civil No. 798–72 and *Kuhn v. Wilson,* Civil No. 956–71 (D.D.C.

Order of March 26, 1975) (consolidated cases), where a claim of privilege was upheld to quash a subpoena *duces tecum* because "the information requested . . . [did] not go to the heart of the plaintiffs' case, and [was] of peripheral relevance at best." Order at 2.

signed to disclose to the public conversations covering 25 days. If the subpoena is read, as it is capable of being read if taken literally, as requiring an entire tape to be produced if any portion of it relates to the May Day demonstrations, plaintiffs would be entitled to discover all conversations recorded on such a day, including those of an intensely personal nature—some of which would be subject to an independent common law privilege. At oral argument plaintiffs disclaimed any interest in such materials. The District Court's memorandum opinion indicates an intention to limit discovery to those portions of the recordings dealing with the demonstrations, but the accompanying order denying the motion to quash does not so explicitly limit the subpoena. While the memorandum opinion could fairly be interpreted as impliedly narrowing the apparently unintended scope of the subpoena, to avoid any possible misunderstanding we remand with direction to the District Court to make such limitation explicit in its order.

In addition, Mr. Buchen's review of the recordings in compliance with the District Court order implicates Mr. Nixon's privacy rights in a manner not contemplated by the Presidential Recordings and Materials Preservation Act. An essential element of the Act is review of the materials by a disinterested, professional archivist, and not by Counsel to an incumbent President, however conscientious he may be. Even under procedures of the Act, the invasion of Mr. Nixon's privacy is "not insignificant," *Nixon v. Administrator, supra,* 408 F.Supp. at 367.

Mr. Nixon has had his personal documents relating to his presidency subjected to the Presidential Recordings and Materi-

als Preservation Act, an action found to be constitutional. *Nixon v. Administrator, supra.* While the three-judge court in *Nixon* enjoined the General Services Administration from "processing, disclosing, inspecting, transferring, or otherwise disposing of any materials" falling within the provisions of the Act pending Mr. Nixon's appeal to the Supreme Court, it specifically did not enjoin any review, inspection, or disclosure "of materials pursuant to any subpoena or other lawful process * * *." *Id.* at 375. In directing Mr. Buchen immediately to undertake review of the subpoenaed documents, the District Court rejected Mr. Nixon's privacy claims as frivolous. In our view, the privacy interests of a former President must be safeguarded.

Our resolution of the problem is a ruling that the District Court should appoint a professional Government archivist as a Special Master to the Court pursuant to Fed.R. Civ.P. 53(a) for the limited purpose of reviewing the designated tape recordings, transcribing those portions of conversations relating to the May Day activities, and transmitting such isolated transcripts to the court.[18] At all times during the review, Mr. Nixon or his representative shall have an absolute and unqualified right to be present; however, the determination of what constitutes material in compliance with the subpoena shall be left with the Special Master. Following transmittal of relevant materials to the Court, and before they are to be turned over to counsel for plaintiffs, Mr. Nixon shall be afforded the right to assert "any rights, defenses or privileges"—whatever they might be—in accordance with the appropriate implementing regulation of the Act. 41 C.F.R. § 105–63.303.[19]

---

**18.** Because of the injunction barring general review of the materials by an archivist, we assume that no formal mechanism has been established to carry out the specific review demanded when a subpoena for certain material issues. If one has been established, the District Court's order can mesh with that system.

**19.** 41 C.F.R. § 105–63.303 provides:

In accordance with the provisions of Subpart 105–63.2, and subject to any rights, defenses, or privileges which the Federal Government or any person may invoke, the Presidential historical materials in the custody and control of the Administrator of General Services will be made available for use in any judicial proceeding, and are subject to subpoena or other lawful process. Requests by the Special for access to the Presidential historical materials, whether by

Under such circumstances, we contemplate a procedure in the District Court identical to that outlined in this court's *en banc* opinion in *Nixon v. Sirica, supra,* 159 U.S. App.D.C. at 79, 487 F.2d at 721. While the parties are directed to that order, we think it sufficient to indicate that the procedure there developed contemplates *in camera* review of the challenged material at which time Mr. Nixon will be able to assert any claims of privilege with particularity. Counsel for plaintiffs will be entitled to inspect the materials in chambers to assist the Court in determining the validity of any claim of privilege. Any ruling adverse to Mr. Nixon is subject to appeal, if that course of action is deemed appropriate. *See, id.* at n. 100.

\*　　\*　　\*

For the reasons stated above, the memorandum and order of the District Court is affirmed in part, reversed in part, and remanded for modification consistent with this opinion. Thereafter the subpoena may issue.

*So ordered.*

MacKINNON, Circuit Judge, concurring in part and dissenting in part:

In my view the majority opinion does not give full consideration to the true basis upon which the privilege rests. The presidential privilege is not something that is completely personal, but is something that adheres to the *office* of the Presidency. It is a privilege which exists to benefit the public, not to benefit a particular public official—past or present. Its purpose is to assure that *the nation* will receive the benefit of honest, untrammeled advice from its officers as rendered to the President. Thus, whether the privilege is claimed by an incumbent or former President does not address the basic purpose for the existence of the privilege. To assert that the privilege shall be interpreted so as to protect incumbent presidents more than former presidents is to inject considerations that

are almost completely foreign to the intended purpose of the privilege and ignores the true reason for the existence of the privilege. The true test should be, regardless of who raises it, whether the disclosure of the particular information *at the particular time it is demanded* would be injurious to the public interest considerations that the privilege is designed to protect.

In applying this standard it must be recognized that eventual disclosure of the advice of a Government official, even though the President to whom the advice was given had left office, might be just as injurious in the future to the nation as disclosure during the incumbency of the President who received the advice. Presidents of opposite parties often succeed each other. If the access to confidential advice given to one President is to be subjected substantially to the post-hoc determination of his successor, the assurance of completely competent advice is likely to be lost entirely. The President to whom the advice was given should be in the best position to state whether the expectation of confidentiality enhanced the advice given to him when he was the incumbent of the office.

Every President inexorably leaves office some time and if every President after he leaves office is to be forced to have his confidential conversations with his trusted advisors treated by some lesser standard than they would while he held office, then every advisor who has a confidential conversation with an incumbent President will always temper his advise by the *eventual* standard that will be applied to its disclosure. The suit will be cut to fit the cloth. Thus, the nation's public interest will suffer by trimmed advice from confidential consultants who no longer can be relied upon to give completely frank advice. Treating confidential advice to presidents by this double standard will operate to substantially depreciate the values that the privilege is designed to protect.

court subpoena or other lawful process, including access pursuant to § 105–63.302–1 shall at

all times have priority over any other requests for the materials.

It would be a mistake to place greater emphasis on the privilege on the particular status of any President and that he alone can claim it. Since it is intended to protect the nation, others with a proper interest should be able to enforce it.

Of course, there is no doubt that time somewhat erodes the privilege with respect to some factual situations, but the erosion should not be substantially influenced by the fact that the President who received the advice has left office.

This is not to say that individual privacy claims in some circumstances might not differ between incumbents and former presidents, but such privacy claims are something different from executive privilege.

The Supreme Court has noted probable jurisdiction in the three-judge court ruling in *Nixon v. Administrator,* 408 F.Supp. 321 (D.D.C.1976), *prob. juris. noted,* 429 U.S. 976, 97 S.Ct. 483, 50 L.Ed.2d 583 (1976). There is thus the possibility the court might interpret *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), and its emphasis on the need for presidential conversations in a *criminal* context to constitute a negative implication as to *civil* suits. The pendency of this issue in the Supreme Court is an adequate basis for deferring our decision in this case, particularly because the majority rely thereon for their conclusion. *See* Maj. Op. at ——, —— —— —— of 182 U.S.App.D.C., at 246, 247 of 561 F.2d. In such circumstances, in my view it would be preferable if we held our decision in abeyance until the Supreme Court decision is rendered. In the absence of such disposition, to the extent of the foregoing I respectfully dissent from the majority opinion but concur generally in the remainder.

On Appellant's Petition for Rehearing

## ORDER

PER CURIAM.

Upon consideration of the petition for rehearing filed herein by appellant Richard Nixon, it is

ORDERED, by the Court, that appellant's aforesaid petition is granted to the extent indicated in the Supplemental Opinion filed herein on this date; in all other respects said petition is denied.

## SUPPLEMENTAL OPINION

Appellant Richard Nixon has filed a petition for rehearing which for the most part repeats arguments already made and rejected. One aspect merits a further word, and that is the objection to that part of this court's opinion that states that the District Court should appoint a professional Government archivist as a "master". We developed this in view of appellant's objection to screening by the counselor to the President. In the petition filed February 11, appellant asserts that he has objections to our alternative—he complains of a conflict of interest because of other litigation pending with GSA, and lack of pertinent expertise. Appellant asserts that he would even prefer screening by the counselor to the President. We do not probe these matters. We will revise our opinion to change "should" to "may", to make it clear that the procedure we have outlined is permissive, not mandatory. If appellant's contentions have merit, the district court can make other arrangements, including reference to the successor to the counsel to the President. In the sound exercise of discretion, after considering suggestions by the parties, the district court may appoint another master. To the extent indicated, the petition for rehearing is granted; otherwise it is denied.