# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued March 18, 2021        Decided August 24, 2021

No. 20-5131

PROTECT DEMOCRACY PROJECT, INC.,
APPELLANT

v.

NATIONAL SECURITY AGENCY,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-01000)

---

*Michael P. Abate* argued the cause for appellant. With him on the briefs was *Benjamin L. Berwick*.

*Samantha L. Chaifetz*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief was *Mark B. Stern*, Attorney.

Before: PILLARD and WALKER, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: The Protect Democracy Project challenges the National Security Agency's decision to

withhold one record from disclosure under the Freedom of Information Act. The record at issue is a memorandum the NSA Deputy Director wrote in 2017, memorializing what was said on a phone call he participated in between President Trump and the NSA Director soon after it occurred. According to an account of the phone call in Special Counsel Robert Mueller's report on Russian interference in the 2016 election, President Trump asked the NSA Director whether he could do anything to refute news stories connecting Trump to the Russian government.

The NSA withheld the memo under a FOIA exemption that incorporates privileges available to the government in civil litigation, claiming executive privilege for presidential communications. The district court sustained the privilege claim. It denied Protect Democracy's request to examine the memo for any segregable passages subject to release under FOIA on the ground that the presidential communications privilege protected the memo in full. The district court also held that the government did not waive the privilege when it published in the Mueller Report a description of the conversation at issue.

Based on our *in camera* review, the memo at issue falls squarely within the scope of the presidential communications privilege. And, as the district court appreciated, our precedent applies the privilege to the memo in its entirety. Protect Democracy cannot shrink the scope of the privilege by invoking FOIA's segregability requirement, even if its FOIA request raises credible allegations of governmental misconduct (a question we need not decide). In addition, the government's description of the phone call in the Mueller Report did not waive the privilege, as not all the information in the memo specifically matches the information released in the report. We thus affirm the district court's decision in full.

**BACKGROUND**

On March 20, 2017, FBI Director James Comey testified before the House Permanent Select Committee on Intelligence that the FBI was conducting a counterintelligence investigation into interference by the Russian government in the 2016 presidential election.  That was the first time the Department of Justice or the FBI publicly disclosed the existence of their investigation.  Director Comey testified at the hearing that, as part of its investigation, the FBI was examining any potential links between President Donald Trump's presidential campaign and the Russian government.  Two months later, on May 9, Trump fired Comey.  Eight days after Comey's firing, Deputy Attorney General Rod Rosenstein appointed former FBI Director Robert Mueller as Special Counsel to oversee the existing FBI investigation.

Soon after Mueller's appointment, the Washington Post reported that Trump had called both the Director of National Intelligence and the Director of the NSA days after Comey's testimony in March to ask that they rebut allegations of coordination between his presidential campaign and the Russian government.  The Post stated that Trump's conversation with Admiral Michael Rogers, the NSA Director at that time, "was documented contemporaneously in an internal memo written by a senior NSA official."  Adam Entous & Ellen Nakashima, *Trump Asked Intelligence Chiefs to Push Back Against FBI Collusion Probe After Comey Revealed Its Existence*, Wash. Post (May 22, 2017), http://wapo.st/2ruKr9n.

Two months later, the media reported that Mueller was investigating whether Trump had obstructed justice in his handling of the FBI investigation, including in his firing of Comey.  The Wall Street Journal stated that Mueller planned to interview the two intelligence chiefs, as well as Richard

Ledgett, who had recently retired as deputy director of the NSA. The Journal identified Ledgett as the senior NSA official who had documented Trump's call with NSA Director Rogers. *See* Del Quentin Wilber, Shane Harris & Paul Sonne, *Mueller Probe Examining Whether Donald Trump Obstructed Justice*, Wall St. J. (June 15, 2017), https://www.wsj.com/articles/mueller-probe-examining-whether-donald-trump-obstructed-justice-1497490897.

In April 2019, the Department of Justice released a partially redacted version of Special Counsel Mueller's report on the results of his investigation. The report confirmed that, in the days after Comey's testimony, Trump asked intelligence community leaders to deny that he had any connection to Russia. The report described Trump's call with Rogers as follows:

> On March 26, 2017 . . . the President called NSA Director Admiral Michael Rogers. The President expressed frustration with the Russia investigation, saying that it made relations with the Russians difficult. The President told Rogers "the thing with the Russians [wa]s messing up" his ability to get things done with Russia. The President also said that the news stories linking him with Russia were not true and asked Rogers if he could do anything to refute the stories. Deputy Director of the NSA Richard Ledgett, who was present for the call, said it was the most unusual thing he had experienced in 40 years of government service. After the call concluded, Ledgett prepared a memorandum that he and Rogers both signed documenting the content of the conversation and the President's request, and they placed the memorandum in a safe. But Rogers did not perceive the President's request to be an

order, and the President did not ask Rogers to push back on the Russia investigation itself. Rogers later testified in a congressional hearing that as NSA Director he had "never been directed to do anything [he] believe[d] to be illegal, immoral, unethical or inappropriate" and did "not recall ever feeling pressured to do so."

Special Counsel Robert S. Mueller, III, Report on the Investigation into Russian Interference in the 2016 Election, Volume II (hereinafter Mueller Report Vol. II) at 56-57 (March 2019) (J.A. 46-47), https://www.justice.gov/archives/sco/file/1373816/download (citations omitted). All footnotes attached to that paragraph reference interviews with Rogers and Ledgett, and the report contains no indication that its authors saw or relied on Ledgett's memo.

This case evolved alongside the developments discussed above. In April 2017, before news outlets reported on any call between Trump and Rogers, Protect Democracy sent a FOIA request to the NSA seeking several categories of documents relating to Russian interference in the 2016 election and links between Trump associates and Russian agents. After waiting a month for a response from the NSA, Protect Democracy sued. In early 2018, Protect Democracy narrowed its FOIA request to any memoranda written by senior NSA officials documenting a conversation between the President or other White House personnel and senior NSA officials "in which the White House asked the NSA to publicly dispute any suggestion of collusion between Russia and the Trump campaign." J.A. 68. The NSA issued a *Glomar* response, declining to confirm or deny the existence of a responsive record. *See Leopold v. CIA*, 987 F.3d 163, 167 (D.C. Cir. 2021). But it withdrew that response after the Mueller Report was released, as the report confirmed the existence of at least one responsive record:

Ledgett's memo on the Trump-Rogers call. The NSA then advised the district court that it had identified that one responsive record but withheld it pursuant to four statutory exemptions from FOIA's disclosure requirements: Exemption 1 (classified material), Exemption 3 (material exempt under other statutes), Exemption 5 (privileged material), and Exemption 6 (material invading personal privacy).

In March 2020, the district court reviewed the record at issue *in camera*. *See Protect Democracy Project v. NSA*, 453 F. Supp. 3d 339, 344 (D.D.C. 2020). It then granted summary judgment to the NSA. *Id.* at 354. The court held that Ledgett's memo was protected by the presidential communications privilege—a component of executive privilege—and thus permissibly withheld under FOIA Exemption 5, which incorporates privileges available to the government in civil litigation. *Id.* at 346-48. The court did not reach the other claims of exemption. *Id*. at 346 n.4. It rejected Protect Democracy's request that it assess whether portions of the memo were segregable under FOIA, citing our precedent that presidential communications privilege applies to documents in their entirety. *Id.* at 348-49 (citing *Judicial Watch, Inc. v. Dep't of Def.*, 913 F.3d 1106, 1111 (D.C. Cir. 2019); *Loving v. Dep't of Def.*, 550 F.3d 32, 37-38 (D.C. Cir. 2008); *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997)). It also declined to recognize an exception to the privilege's protection based on Protect Democracy's allegations of government wrongdoing. *Id.* at 349-51. And it held that the Mueller Report's description of the President's phone call did not constitute an official acknowledgment of information in Ledgett's memo and thus a waiver that would have allowed Protect Democracy to compel disclosure despite the NSA's valid exemption claim. *Id.* at 352-54.

Protect Democracy noticed its appeal and filed a petition for initial hearing en banc. It argued that initial en banc consideration was warranted because "[t]he facts of this case present a compelling reason for reconsidering [this court's] precedents and allowing segregability in FOIA cases" of nonprivileged information in documents that include presidential communications. Initial En Banc Consideration Pet. 4. The court denied that petition. *See* Order, *Protect Democracy Project, Inc. v. NSA*, No. 20-5131 (D.C. Cir. July 7, 2020). Briefing and argument before this panel followed.

## ANALYSIS

On appeal, Protect Democracy argues that a record exempt from disclosure under FOIA on the basis of the presidential communications privilege, but that arguably contains nonprivileged information, should be reviewed to determine whether the nonprivileged information can be segregated and released. Alternatively, it asserts that segregability should be allowed where those portions of a record not protected by the privilege are credibly alleged to concern presidential misconduct. Protect Democracy also argues the Mueller Report constituted an official acknowledgment of information in Ledgett's memo, thereby waiving the government's right to assert the presidential communications privilege over that information. We review the district court's grant of summary judgment in FOIA cases de novo. *See Judicial Watch, Inc. v. Dep't of Def.* (*Judicial Watch III*), 913 F.3d 1106, 1110 (D.C. Cir. 2019). We first address Protect Democracy's claims about the presidential communications privilege and its interaction with FOIA's segregability requirement, including where presidential misconduct is claimed. We then turn to the issue of waiver.

## A. Segregability

FOIA requires federal agencies to disclose to the public records requested under the Act unless the records fall into one of nine statutory exemptions.  *See* 5 U.S.C. § 552(b).  When a FOIA exemption covers a requested agency record, FOIA's terms require that "[a]ny reasonably segregable portion of [that] record . . . be provided to any person requesting such record after deletion of the portions which are exempt."  *Id.*

Exemption 5, the only exemption at issue in this appeal, allows the government to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  *Id.* § 552(b)(5).  "As the text indicates—albeit in a less-than-straightforward way—this exemption incorporates the privileges available to Government agencies in civil litigation."  *Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021).  In addition to the attorney-client privilege and the attorney work-product doctrine, the incorporated privileges include those recognized as components of executive privilege, including the deliberative process privilege and presidential communications privilege.  *See Judicial Watch III*, 913 F.3d at 1109.

The government here relies on the presidential communications privilege, which the Supreme Court first affirmatively endorsed half a century ago in *United States v. Nixon* (*Nixon I*), 418 U.S. 683 (1974).  The Court explained that "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately."  *Id.* at 708.  Such considerations justified what it called "a presumptive privilege for Presidential communications."  *Id.*

The Court later described the presidential communications privilege as "limited to communications 'in performance of (a President's) responsibilities,' 'of his office,' and made 'in the process of shaping policies and making decisions.'" *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (quoting *Nixon I*, 418 U.S. at 711, 713, 708). Or, as we have summarized, the privilege applies to "documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential." *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997). "At core, the presidential communications privilege is rooted in the President's need for confidentiality in the communications of his office, in order to effectively and faithfully carry out his Article II duties and to protect the effectiveness of the executive decision-making process." *Judicial Watch, Inc. v. Dep't of Justice* (*Judicial Watch I*), 365 F.3d 1108, 1115 (D.C. Cir. 2004) (citations and internal quotation marks omitted).

The nature and scope of the presidential communications privilege is clearer when contrasted to the deliberative process privilege. The deliberative process privilege is primarily a common law privilege, and it covers records documenting the decisionmaking of executive officials generally. *In re Sealed*, 121 F.3d at 745. The presidential communications privilege is a constitutionally based privilege, and it applies to records of nonpublic presidential communications specifically. *Id.* "Consequently," we have held, "congressional or judicial negation of the presidential communications privilege is subject to greater scrutiny than denial of the deliberative [process] privilege." *Id.* And, importantly here, whereas the deliberative process privilege covers only pre-decisional and deliberative material, the presidential privilege covers documents "in their entirety," including post-decisional and factual material within a record. *Id.* at 745-46; *accord Loving v. Dep't of Def.*, 550 F.3d 32, 37-38 (D.C. Cir. 2008). In this

way, the presidential communications privilege is broader than its deliberative process cognate.

Like the deliberative process privilege, the presidential communications privilege is qualified, not absolute, so when invoked in a civil or criminal case, for example, it may be overcome by an adequate showing of need. *See In re Sealed*, 121 F.3d at 753-57 (grand jury subpoena); *Dellums v. Powell*, 561 F.2d 242, 247-50 (D.C. Cir. 1977) (civil litigation). But we have held that, because "the particular purpose for which a FOIA plaintiff seeks information is not relevant in determining whether FOIA requires disclosure," a need showing does not figure into privilege determinations under FOIA in the way it does in non-FOIA litigation. *Judicial Watch III*, 913 F.3d at 1112 (quoting *Loving*, 550 F.3d at 40). In the FOIA context, once even a qualified privilege like the presidential communications privilege applies to a record claimed exempt from disclosure under Exemption 5, a need showing does not overcome it. *Id*.

**1.**

Our own *in camera* review of Ledgett's memo confirms it was properly withheld pursuant to FOIA Exemption 5. The Memo memorializes a phone call that was initiated by the President in which he discussed and sought information relevant to his deliberation over issues connected to foreign relations and intelligence-gathering. Such a document falls squarely within the scope of the presidential communications privilege for two main reasons.

First, the memo "reflect[s] presidential decisionmaking and deliberations." *In re Sealed*, 121 F.3d at 744.[1] Its

---

[1] "[T]he issue of whether a President must personally invoke the [presidential communications] privilege remains an open question,

disclosure "would reveal the President's deliberations." *Judicial Watch III*, 913 F.3d at 1113. Ledgett's memo documents a conversation in which President Trump was himself a direct participant, much like the tape recordings at issue in the *Nixon* cases. *See In re Sealed*, 121 F.3d at 747. Records of what was said by or directly to the President lie at the heart of the presidential communications privilege. *See id.* at 752 (explaining that the privilege "is bottomed on a recognition of the unique role of the President"); *cf. Judicial Watch I*, 365 F.3d at 1112 (declining to extend the privilege to "internal agency documents that are 'not solicited and received' by the President or his Office"); *Loving*, 550 F.3d at 39-40 ("Nothing in [*Judicial Watch I*] disturbs the established principle that communications 'directly involving' the President . . . are entitled to the privilege, regardless of whether the President solicited them.").[2]

Second, the conversation memorialized in Ledgett's memo concerns "the President's Article II powers and

---

and the court need not decide it now," as neither party raised it below or on appeal. *Judicial Watch I*, 365 F.3d at 1114; *see In re Sealed*, 121 F.3d at 744-45 n.16 (describing history of Presidents' personal assertions of the privilege, but noting that we did not need to decide whether the privilege must be invoked by the President personally in a case in which he had done so).

[2] Protect Democracy emphasizes our statement that the privilege "should never serve as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President," *In re Sealed*, 121 F.3d at 752, arguing that the privilege does not cover the phone call because the conversation required no "direct decisionmaking" by the President. But that portion of *In re Sealed Case* concerned communications that did not directly involve the President. Elsewhere in that case, we explained that the privilege covers "materials *connected to* presidential decisionmaking." *Id*. at 745 (emphasis added).

responsibilities," which form "the constitutional basis of the presidential communications privilege." *In re Sealed*, 121 F.3d at 748. As described in an NSA declaration, "Admiral Rogers provided the President with information and analysis based on specific NSA intelligence . . . in the context of a conversation related to national security and foreign affairs." J.A. 54. Even the Mueller Report, which investigated the call in relation to concerns about potential obstruction of justice, establishes that Trump and Rogers discussed matters of foreign relations. *See* Mueller Report Vol. II at 56 (Trump told Rogers the FBI investigation into alleged links with Russia "made relations with the Russians difficult."); *id.* at 60-61 (characterizing the evidence regarding Trump's responses to Comey's testimony as, in part, "indicat[ing] that the President was concerned about the impact of the Russia investigation on his ability to govern"). Those issues implicate the President's responsibilities and his legitimate interest in confidentiality. *See Nixon I*, 418 U.S. at 710-11; *Judicial Watch III*, 913 F.3d at 1111-12 (applying the privilege in the context of "a highly sensitive subject with serious direct and collateral consequences for foreign relations").

Indeed, Protect Democracy does not dispute the district court's holding that at least part of Ledgett's memo is protected by the presidential communications privilege. It instead argues against applying the privilege to any portion of the memo that concerns Trump's question, as described in the Mueller Report, whether Rogers "could do anything to refute the stories." J.A. 46. According to Protect Democracy, Trump's request falls outside the President's Article II powers so is unrelated to presidential decisionmaking. Because, in its view, such information falls outside the scope of the privilege, Protect Democracy contends that we should require examination of Ledgett's memo to determine which, if any, parts are

"reasonably segregable" and subject to disclosure under FOIA. 5 U.S.C. § 552(b).

The problem for Protect Democracy is that, under existing precedent, the presidential communications privilege "applies to documents in their entirety." *In re Sealed*, 121 F.3d at 745. As a result of that principle, we have previously indicated that a record protected by the privilege is not segregable in response to a FOIA request. We described the scope of the presidential communications privilege in the context of FOIA Exemption 5 when comparing it to its counterpart, the deliberative process privilege. "The [presidential communications] privilege covers documents reflecting 'presidential decisionmaking and deliberations,' regardless of whether the documents are predecisional or not, and it covers the documents in their entirety." *Loving*, 550 F.3d at 37-38 (quoting *In re Sealed*, 121 F.3d at 744-45). "Unlike the presidential communications privilege," we explained, "the deliberative process privilege does not protect documents in their entirety; if the government can segregate and disclose non-privileged factual information within a document, it must." *Id.* at 38. We more recently held that, because "[o]nce the [presidential communications] privilege applies, the entirety of the document is protected" under FOIA Exemption 5, *Judicial Watch III*, 913 F.3d at 1111, "the question of segregability of non-exempt material is . . . not presented," *id.* at 1113. Even accepting, then, Protect Democracy's claim that portions of Ledgett's memo would not be privileged if they existed in isolation, they are nonetheless not segregable under FOIA as part of the memo—a document made to memorialize only one conversation and that, based on our *in camera* review, otherwise falls squarely within the scope of the privilege.

Protect Democracy challenges our precedent on this point as contrary to FOIA's plain text, which refers to segregation of

nonprivileged parts of government records. But we have already rejected that line of argument in an Exemption 5 case, holding that "there are no segregable parts" where a document is protected in its entirety by the relevant privilege—there, the attorney work product doctrine, which covers even factual work product. *Judicial Watch, Inc. v. Dep't of Justice* (*Judicial Watch II*), 432 F.3d 366, 370-71 (D.C. Cir. 2005). FOIA's segregability requirement presumes that some part of a document is not exempt; it requires disclosure of "any reasonably segregable portions . . . after deletion of the portions which are exempt." 5 U.S.C. § 552(b). But where an entire document is protected by a privilege, as is the case here, "there simply are no reasonably segregable portions . . . to release *after* deletion of the portions which are exempt." *Judicial Watch II*, 432 F.3d at 370 (formatting modified).

Seeking a way around that complete coverage, Protect Democracy urges us to overrule the precedent that applies the presidential communications privilege to an entire document so as to render segregability analysis inapplicable. Appellant Br. 25-26. Protect Democracy echoes the district court's concern that an entire-document rule might allow the government to incorporate materials covered by the privilege into a document that would not otherwise be, thus improperly shielding the latter from FOIA disclosure. *See Protect Democracy*, 453 F. Supp. 3d at 350. But even as it describes this case as "a uniquely good vehicle" for overruling precedent, Appellant Br. 30, it provides no reason to think that any such tail-wagging-dog abuse of the privilege occurred here. Our review of Ledgett's short memo confirms that it memorializes a single, limited conversation. In any event, our circuit precedent binds us as a panel, *see LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996), so we take this argument as Protect Democracy's preservation of the point for potential en banc review.

**2.**

Protect Democracy alternatively argues that we should require segregation and disclosure under FOIA where a plaintiff credibly alleges that a record of a privileged presidential communication contains information manifesting governmental misconduct. Even if our precedent does not generally require segregation of those portions of records not involving protected presidential communications, says Protect Democracy, this panel should "carve out a narrow exception" to the non-segregability rule for cases involving allegations of misconduct on the part of high-ranking executive branch officials. Reply Br. 13 n.5. Protect Democracy points out that none of our decisions on segregability and the presidential communications privilege involved claims of misconduct. By contrast, it asserts, "[t]he focus and purpose of the [Ledgett] Memorandum, and the occasion for its authorship, was to *document the President's inappropriate conduct*." Appellant Br. 35. And evidence of that asserted misconduct "comes from a uniquely credible source," namely Special Counsel Mueller. *Id.* at 34.

There is no precedent binding on this court that recognizes the misconduct exception Protect Democracy proposes. Protect Democracy argues that "it is quite common in a FOIA case for a court to disregard a claim of exemption altogether where a credible allegation of government misconduct is made." Appellant Br. 31. But the authority it cites concerns a different FOIA exemption, covering information compiled for law enforcement purposes. *Id.* (citing *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004); *Roth v. Dep't of Justice*, 642 F.3d 1161, 1181 (D.C. Cir. 2011)). That exemption excludes such information from FOIA's ambit "only to the extent that," as relevant here, it "could reasonably be expected to constitute an unwarranted invasion of personal

privacy." 5 U.S.C. § 552 (b)(7). To determine whether an invasion of privacy is "unwarranted," courts balance the privacy interest against the public interest in disclosure, including any potential interest in airing governmental misconduct. *See Favish*, 541 U.S. at 174; *Roth*, 642 F.3d at 1181.

No such balancing or consideration of public interest is called for under Exemption 5. It instead exempts from coverage any "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency," 5 U.S.C. § 552 (b)(5), meaning documents "normally privileged in the civil discovery context," *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975); *see also id.* at 149 n.16. And as we have explained, insofar as their incorporation into FOIA by Exemption 5 is concerned, privileges otherwise potentially overcome by a showing of need are not susceptible of such balancing. *See Loving*, 550 F.3d at 41 (presidential communications privilege precedent "forecloses" the claim that the "public interest in [a] document overcomes the privilege").

Protect Democracy insists that, in asking us to craft a special segregability rule in cases involving credible allegations of misconduct, it does not seek to overcome the privilege—it seeks access only to those parts of a record that are not privileged. But insofar as the memo is protected—meaning privileged—in its entirety, any effort to render the document segregable necessarily amounts to an effort to overcome the privilege. The cases that Protect Democracy cites in arguing misconduct can be relevant to the threshold application of the presidential communications privilege in fact consider misconduct only at the next step of privilege analysis—that is, in determining whether the privilege has been overcome. *See In re Sealed*, 121 F.3d at 746; *Dellums*, 561

F.2d at 247.  Because a FOIA request cannot overcome the privilege, such cases are of no help to Protect Democracy here.

Even assuming that Protect Democracy could overcome the privilege, its allegations of misconduct would not help it do so.  Protect Democracy cites district court cases recognizing a misconduct exception to the deliberative process privilege. *See, e.g.*, *Nat'l Whistleblower Ctr. v. Dep't of Health & Hum. Servs.*, 903 F. Supp. 2d 59, 66-67 (D.D.C. 2012).  The cited basis for the exception is *In re Sealed Case*, which noted that "where there is reason to believe the documents sought may shed light on government misconduct, 'the [deliberative process privilege] is routinely denied[.]'" 121 F.3d at 738 (quoting *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995)).[3]  But *In re Sealed Case* expressly rejected any similar such approach to the presidential communications privilege.  *See id.* at 746.  Instead, "a party seeking to overcome [that] privilege seemingly must always provide a focused demonstration of need, even when there are allegations of misconduct by high-level officials."  *Id.*

Protect Democracy makes no such showing here.  The closest it gets is in citing "the public's compelling need to understand the myriad ways their President attempted to obstruct justice."  Appellant Br. 32.  But the showing that is required to overcome the presidential communications privilege does not turn "on the nature of the presidential

---

[3] Other district court decisions have concluded that that language from *In re Sealed Case* is inapplicable in the FOIA context, *see Ctr. for Pub. Integrity v. Dep't of Def.*, 486 F. Supp. 3d 317, 331-32 (D.D.C. 2020); *Judicial Watch, Inc. v. Dep't of State*, 241 F. Supp. 3d 174, 182-83 (D.D.C. 2017), in light of our statement in *In re Sealed Case* that FOIA requests cannot overcome the deliberative process privilege, *see* 121 F.3d at 737 n.5.  We need not resolve that issue here.

conduct that the [requested] material might reveal." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974). "In holding that the Watergate Special Prosecutor had provided a sufficient showing of evidentiary need to obtain tapes of President Nixon's conversations," for instance, "the Supreme Court made no mention of the fact that the tapes were sought for use in a trial of former presidential assistants charged with engaging in a criminal conspiracy while in office." *In re Sealed*, 121 F.3d at 746. What matters instead is "the function for which [the] evidence is sought." *Id.* It is unclear how Protect Democracy—which is neither a litigant in need of Ledgett's memo as evidence nor a governmental entity investigating government misconduct, but rather a private FOIA plaintiff—could make any showing of such need.

In short, Ledgett's memo is covered by the presidential communications privilege in its entirety, and Protect Democracy's various efforts to get around that privilege's protections through FOIA's segregability requirement fail. We thus affirm the district court's decision that the government properly withheld the memo pursuant to FOIA Exemption 5.

## B. Waiver

Protect Democracy also contends that, even if Ledgett's memo is privileged, the government waived the privilege as to matters disclosed in the Mueller Report. It makes its claim of waiver under our "official acknowledgment" doctrine. We have held that, "[i]f the government has officially acknowledged information, a FOIA plaintiff may compel disclosure of that information even over an agency's otherwise valid exemption claim." *ACLU v. Dep't of Def.*, 628 F.3d 612, 620 (D.C. Cir. 2011). But not just any acknowledgement will do:

For information to qualify as "officially acknowledged," it must satisfy three criteria: (1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented disclosure.

*Id.* at 620-21. "Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007).

Because application of the "official acknowledgment" doctrine to a record withheld pursuant to Exemption 5 would result in release of privileged material, the standard for waiver of executive privilege is also relevant to our analysis. *Cf. Nat'l Sec. Counselors v. CIA*, 969 F.3d 406, 410-11 (D.C. Cir. 2020) (considering waiver of attorney-client privilege as to documents withheld under Exemption 5 separately from the "official acknowledgment" doctrine).

"Since executive privilege exists to aid the governmental decisionmaking process, a waiver should not be lightly inferred." *In re Sealed*, 121 F.3d at 741 (citation omitted). One way that executive privilege doctrine imposes a high bar for waiver is in limiting waiver by disclosure. In the attorney-client privilege context, "voluntary disclosure of privileged material . . . to unnecessary third parties . . . 'waives the privilege, not only as to the specific communication disclosed but often as to all other communications relating to the same subject matter.'" *Id.* (quoting *In re Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982)). "But this all-or-nothing approach has not been adopted with regard to executive privileges

generally . . . . Instead, courts have said that release of a document only waives these privileges for the document or information specifically released, and not for related materials." *Id.* In *In re Sealed Case*, for instance, we held that deliberate public release of a final White House Counsel report prepared for the President regarding misconduct by the Secretary of Agriculture did "not waive the privilege in regard to the documents the White House generated in producing the ultimate version [of that final report]." *Id.*

Analyzed under the terms of either the FOIA official acknowledgment doctrine or executive privilege waiver doctrine generally, the government's publication of the Mueller Report did not waive privilege as to Ledgett's memo. There seems to be no dispute that the Mueller Report constitutes an official disclosure, so the question under both doctrines is whether the information disclosed is a close enough match to the information withheld. *See ACLU*, 628 F.3d at 620; *In re Sealed*, 121 F.3d at 741. Our *in camera* review of Ledgett's memo confirms that it is not. "[T]here are substantive differences between the disclosed [information] and the information that has been withheld." *ACLU*, 628 F.3d at 620.

Protect Democracy's claim that the report "directly describes the contents" of the memo is inaccurate. Reply Br. 18. The report confirms the existence of that memo and describes the contents of the same phone call memorialized by Ledgett. But the report and the memo are not a complete match; the memo contains details and statements that were not disclosed in the report. Appellant suggests that "the Mueller Report was drawn from [Ledgett's memo] directly and from the testimony of the men responsible for its creation," Reply Br. 18, but the report itself provides support for only the latter half of that proposition: It states that it was based on interviews

with NSA Director Rogers and Deputy Director Ledgett, and makes no reference to the memo itself.

To be sure, the Mueller Report contains much information similar to information found in Ledgett's memo. Protect Democracy accordingly argues that the government must disclose any parts that "match the facts revealed" in the report. Appellant Br. 37. This request, of course, sounds familiar: It would in effect require segregability through waiver analysis— a result in tension with our holding that Ledgett's memo is either privileged in full or not at all. Even assuming that such a result were permissible, the matching information in the report is not "as specific as the information" in the memo. *ACLU*, 628 F.3d at 620. Release of the report thus did not effect a waiver as to any subset of information contained in Ledgett's memo.

\*   \*   \*

For the foregoing reasons, we affirm the district court's decision granting the NSA's motion for summary judgment and denying Protect Democracy's cross-motion for summary judgment.

*So ordered.*