Morton HALPERIN et al., Appellants,

v.

Henry KISSINGER et al.

Morton HALPERIN et al.

v.

Henry KISSINGER et al.
Richard M. Nixon, John N. Mitchell, and
H. R. Haldeman, Appellants.

Nos. 77–2014, 77–2015.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 9, 1979.

Decided July 12, 1979.

Mark H. Lynch, Washington, D.C., with whom John H. F. Shattuck, Washington, D. C., and Jack D. Novik, New York City, were on brief, for appellants in No. 77–2014.

Larry L. Gregg, Atty., Dept. of Justice, Washington, D. C., for appellees in No. 77–2014 and cross-appellants in No. 77–2015. John C. Keeney, Acting Asst. Atty. Gen., Robert L. Keuch, Deputy Asst. Atty. Gen., and George W. Calhoun and Lubomyr M. Jachnycky, Attys., Dept. of Justice, Washington, D. C., were on brief for appellees in No. 77–2014 and cross-appellants in No. 77–2015. Benjamin C. Flannagan, D. Jeffrey Hirschberg, and Philip B. Heyman, Attys., Dept. of Justice, Washington, D. C., also entered appearances for appellees in No. 77–2014 and cross-appellants in No. 77–2015.

Joseph E. Casey, Washington, D. C., entered on appearance for appellee William Sullivan in Nos. 77–2014 and 77–2015.

James J. Bierbower, Washington, D. C., for appellee Jeb Stuart Magruder in No. 77–2015.

Before WRIGHT, Chief Judge, ROBINSON, Circuit Judge, and GESELL,* District Judge.

Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.

Concurring opinion filed by District Judge GESELL.

J. SKELLY WRIGHT, Chief Judge:

Morton Halperin, a former member of the National Security Council (NSC) staff, and his family sued ten federal officials for money damages following revelations that their home telephone had been tapped by the Government from May 1969 until February 1971.[1] The Halperins alleged that the wiretap, which was installed during an investigation into public disclosures of confidential information,[2] was prohibited by both the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968.[3] On cross-motions for summary judgment in December 1976 the District Court ruled in favor of all defendants except former President Richard M. Nixon, former Attorney General John N. Mitchell, and former presidential aide H. R. Haldeman.[4] The court concluded that Nixon, Mitchell, and Haldeman had violated the Halperins' Fourth Amendment rights, but not the terms of Title III. The Halperins

were awarded $1 in nominal damages in August 1977.[5]

Plaintiffs and defendants Nixon, Mitchell, and Haldeman appeal the decision.[6] The Halperins insist that the District Court erred in not applying Title III, in awarding only nominal damages, and in granting summary judgment in favor of former National Security Adviser Henry Kissinger. The defendants claim absolute immunity from this action and dispute the District Court's refusal to bar the suit on qualified immunity grounds. We affirm the District Court's conclusions on the immunity question, but reverse on the applicability of Title III, the proper measures of damages, and defendant Kissinger's motion for summary judgment. In addition, we believe that the District Court should have applied the warrant requirement for national security wiretaps as articulated in *United States v. United States District Court (Keith)*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), and *Zweibon v. Mitchell (Zweibon I)*, 170 U.S.App.D.C. 1, 516 F.2d 594 (1975) (*en banc*), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).

## I. THE WIRETAP

Shortly after taking office in 1969 President Nixon and his top advisers grew concerned over press disclosures of classified

---

\* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. The defendants were President Richard Nixon, former Attorney General John Mitchell, National Security Adviser Henry Kissinger, presidential aides H. R. Haldeman, John Ehrlichman, Alexander Haig and Jeb Magruder, FBI Director Clarence Kelley and FBI official William Sullivan, and Assistant Attorney General Robert Mardian. The suit also named the Chesapeake & Potomac Telephone Company (C&P) as a defendant, but plaintiffs do not appeal the District Court's judgment in favor of C&P. Joining Halperin in the complaint were his wife, Ina, and their three minor children.

2. The investigation eventually included electronic surveillance of 13 Government employees and four newspaper reporters, including the appellant in a case we also decide today, *Smith v. Nixon*, 196 U.S.App.D.C. ——, 606 F.2d 1183 (1979).

3. Pub.L.No.90–351, 82 Stat. 212 (1968) (codified at 18 U.S.C. §§ 2510–2520 (1976)).

4. *Halperin v. Kissinger*, 424 F.Supp. 838 (D.D.C.1976).

5. *Halperin v. Kissinger*, 434 F.Supp. 1193 (D.D.C.1977). If the court had found Title III applicable, plaintiffs would have been entitled to $100 in liquidated damages for each day of illegal wiretapping, plus punitive damages and attorney fees. *See* 18 U.S.C. § 2520 (1976).

6. Because both sides appeal the decision of the District Court, it is easier to identify the parties by their status in the trial court, in order to avoid confusion among appellants, cross-appellants, and the like. We refer to the Halperins as plaintiffs and Nixon, Mitchell, Haldeman, and Kissinger as defendants.

information.[7] In their view such "leaks" limited the Administration's flexibility in developing foreign policy and could have eroded the candor of foreign governments in dealings with this country. On April 25, 1969 the President met in his office with Kissinger, Mitchell, and J. Edgar Hoover, the late Director of the Federal Bureau of Investigation (FBI), to discuss methods for controlling leaks. Mitchell, Hoover, and Nixon continued the discussion over dinner at Camp David that evening and developed a program, including wiretaps on private telephones, for investigation of suspected "leakers."[8] Both Mitchell and Hoover assured Nixon that the President could order such wiretapping without first obtaining a court order.[9] Three criteria were established at the meeting for identifying individuals to be investigated: (1) access to sensitive data that was being revealed publicly; (2) information in security files that "raised questions" about an individual; and

(3) other incriminating information in FBI files.[10]

Over the next two weeks the appearance of several newspaper stories seemingly based on classified reports heightened the Administration's alarm over leaks.[11] The surveillance program was finally triggered by a *New York Times* article on May 9 revealing massive American bombing of targets in Cambodia.[12] Nixon told Kissinger to ask the FBI to investigate the source for the story.[13] Although Halperin had no access to the information in the *Times* article,[14] FBI Director Hoover informed Kissinger that Halperin was the "prime suspect."[15] Hoover and Kissinger conferred by telephone four times that day,[16] and the wiretap on the Halperin home telephone was in place by evening.[17] Earlier that day, however, Kissinger had informed Halperin that he was considered a potential leaker, and the two men agreed that Halperin's access to classified information should be curtailed in order to allay suspicions.[18]

---

**7.** In response to interrogatories Kissinger listed 20 newspaper articles between February 3, 1969 and May 6, 1969 that in his opinion were based on leaked information. Joint Appendix (JA) 129–132.

**8.** Nixon Deposition at 18–22, 25–26; Mitchell Deposition at 20–21.

**9.** Mitchell Deposition at 76–79, 81–85; Nixon Deposition at 19–21.

**10.** Nixon Deposition at 61; Kissinger Deposition at 28. On these facts the District Court concluded that President Nixon "authorized a program of electronic surveillance of individuals suspected of leaking information detrimental to the national defense and foreign policy of the United States." *Halperin v. Kissinger, supra* note 4, 424 F.Supp. at 840.

**11.** *See Chronology of Events Relative to the Seventeen Wiretaps and Pertinent Documents,* in *Dr. Kissinger's Role in Wiretapping: Hearings Before the Senate Foreign Relations Committee,* 93d Cong., 2d Sess. 22–23 (1974) (hereinafter cited as *Kissinger Hearings*).

**12.** *Raids in Cambodia by U.S. Go Unprotested,* N.Y. Times, May 9, 1969, at 1, col. 3.

**13.** Nixon Deposition at 23; Kissinger Deposition at 50.

**14.** Halperin Affidavit (Nov. 12, 1973), JA 102.

**15.** Kissinger Deposition at 48–49. Hoover alleged that Halperin had been a roommate of the reporter who wrote the story. *Id.* Two other items in Halperin's files were deemed to raise questions about his reliability: (1) failure to report in a 1966 Department of Defense form that he had stopped in Greece, Yugoslavia, and the Soviet Union on a previous round-the-world journey; and (2) incorrect identification of a Russian national with whom he lunched in 1967. JA 241–244; *see Kissinger Hearings, supra* note 11, at 182 (testimony of H. Kissinger) (blanks in testimony filled in by answers to interrogatories at JA 133). Halperin attributed the first omission to clerical oversight and the second to his error. JA 219–221. An internal FBI memorandum from Hoover identified Halperin as agreeing to a 1965 proposal for a national sit-in on the Vietnam War, as having subscribed to a Marxist publication, and as being a "so-called arrogant harvard-type [sic] Kennedy" man. JA 49–50. For a discussion of Halperin's allegation that he was singled out for surveillance for political reasons, *see* text accompanying notes 82–84 *infra.*

**16.** *Chronology,* in *Kissinger Hearings, supra* note 11, at 23.

**17.** *Id.* at 80 (testimony of J. Adams, Deputy Associate Director of FBI).

**18.** Halperin Affidavit, *supra* note 14, JA 102–103; Kissinger Deposition at 58–59.

Three other private telephones were wiretapped in the attempt to find the source of the May 9 article.[19]

The following day FBI officials and Colonel Alexander Haig, Kissinger's assistant, worked out procedures to conduct the surveillance "with no record maintained" in normal FBI files.[20] The Bureau then formally requested wiretap authorization from the Attorney General. With respect to Halperin, the FBI memorandum stated only:

> Halperin, aged 30, was detailed from the Department of Defense to the National Security Council as a senior staff member on January 21, 1969. He was the subject of an applicant-type investigation by the Bureau. While admittedly he has had contact with Soviet nationals the investigation did not disclose at that time any pertinent derogatory information.[21]

Attorney General Mitchell approved the wiretap.[22]

The FBI agents conducting the surveillance compiled summaries of the overheard conversations, but neither preserved the tapes of the conversations nor attempted to minimize overhearing of personal discussions.[23] Despite observations by the FBI in May and June of 1969 that the Halperin tap was not producing evidence of a leak,[24] Kissinger requested that the taps be continued.[25] On July 8, 1969 the FBI recommended ending some of the electronic surveillance of suspected leakers, including Halperin.[26] On September 15 Kissinger requested termination of all wiretaps except Halperin's and one other.[27] Four days later Halperin resigned from the NSC staff, although at Kissinger's request he continued as a consultant to the Council.[28]

Halperin retained his consultant position until May 1970, but had no access to classified information during that period, and worked only one day for the NSC.[29] The wiretap remained in place. Nor was there any reduction in surveillance when he resigned from his consultant position in protest over the American invasion of Cambodia in May 1970. After that resignation, however, the FBI reports on the wiretap were no longer sent to the National Security Adviser, but went to Haldeman, the President's chief administrative aide.[30] In July 1970 the FBI agent in charge of the wiretap suggested to his superior that the

---

19. Memorandum from W. C. Sullivan to C. D. DeLoach (May 11, 1969), JA 51.

20. *Id.*

21. Memorandum from J. E. Hoover to Attorney General (May 12, 1969), JA 52.

22. On May 6, 1969 Attorney General Mitchell had promulgated procedures to be followed in warrantless national security surveillance. Memorandum from the Attorney General to Director, FBI (May 6, 1969), JA 38–45. The procedures specified in that memo—including that a wiretap authorization request identify the target premises and estimate the period of surveillance—were not followed in the instant case. The Justice Department's policy of requiring renewals of wiretap authorizations every 90 days, *see* Mitchell Deposition at 9–10, was also ignored.

23. Jones Deposition at 24–27.

24. Memorandum from W. C. Sullivan to C. D. DeLoach (May 15, 1969), JA 54; Memorandum from W. C. Sullivan to C. D. DeLoach (June 20, 1969), JA 58.

25. Letter from W. C. Sullivan to J. E. Hoover (May 20, 1969), JA 55 ("Dr. Kissinger said he wanted the coverage to continue for a while longer"); Memorandum from A. Haig to H. A. Kissinger (June 4, 1969), JA 57 (series of "Talking Points" for meeting with Hoover: recommending continuing Halperin tap "so that a pattern of innocence can be firmly established").

26. Letter from W. C. Sullivan to J. E. Hoover (July 8, 1969), JA 59 ("Halperin has said almost nothing on the telephone. My guess is that he assumes it is tapped.").

27. Memorandum from W. C. Sullivan to C. D. DeLoach (Sept. 15, 1969), JA 60.

28. Halperin Affidavit, *supra* note 14, JA 104.

29. *Id. See* JA 161 (Kissinger's answers to interrogatories).

30. Memorandum from C. D. DeLoach to W. C. Sullivan (May 13, 1970), JA 75; Haldeman Deposition at 52–54.

surveillance be lifted,[31] but it continued until February 10, 1971.[32]

Plaintiffs cite FBI logs showing that agents overheard more than 600 calls on the Halperin telephone, of which only 28 percent were between Halperin and people outside the family.[33] The summary letters from the FBI contain much political information, covering such topics as planned publications criticizing the nation's Vietnam policy,[34] congressional lobbying on war-related legislation,[35] and political campaign plans, including potential opposition to President Nixon in 1972.[36] There is some evidence that the political information was valued at the White House. Disclosure in one of the Halperin summary letters that a former cabinet officer planned a magazine article opposing the Nixon Administration's foreign policy served as the basis for a planned "counter-attack" to the anticipated article.[37] The FBI summaries revealed no evidence suggesting that Halperin was leaking classified data.[38]

The records of the Halperin wiretap were minimal. At first the FBI logs were kept at the Bureau in special files, where Kis-

31. Note to W. C. Sullivan, JA 78 ("I haven't noticed much info of value in recent months from coverage—suggest consider discontinuing").

32. The taps were removed at the instigation of the FBI, Memorandum from W. C. Sullivan to C. Tolson (Feb. 10, 1971), JA 81; Memorandum from J. E. Hoover to Attorney General (Feb. 11, 1971), JA 83, which had recently been criticized for its wiretapping practices. *Chronology*, in *Kissinger Hearings, supra* note 11, at 29 (citing Feb. 7, 1971 newspaper article criticizing FBI wiretapping). Director Hoover was scheduled to testify before Congress shortly thereafter. *See* S.Rep. No. 94–755, Book III, 94th Cong., 2d Sess. 326 (1976).

33. Plaintiffs-appellants' brief at 11–12. The FBI logs, which are not complete, JA 115, show that 638 calls on the Halperin phone were recorded in whole or in part. Morton Halperin was party to 355 (55%) of the recorded calls on 253 separate dates, but 173 calls (27% of the total) were between him and his wife. Two hundred and seventy-seven (43%) of the calls were between Ina Halperin and persons not involved in this suit. Their three minor children were each overheard in at least one conversation in which they were identified, and 13 other log entries refer to unidentified children.

34. Letter from J. E. Hoover to H. R. Haldeman (Oct. 14, 1970), addendum to plaintiffs-appellants' brief at 3 ("Halperin said he was writing a paper on the President's speech which he intended to give Max Frankel of the 'New York Times' to use as he desired. He also said that he was writing a newspaper article on Vietnam.").

35. Letter from J. E. Hoover to H. R. Haldeman (May 26, 1970), *id.* at 2 (discussion of McGovern-Hatfield Amendment to cut off military funds); Letter from J. E. Hoover to H. R. Haldeman (June 23, 1970), *id.* at 3 (Halperin "agreed to talk to the 'top people' in the offices of Senators Norris Cotton and James B. Pear-

son on the war in Cambodia. [ ] described Senator Cotton as 'marginal' on the Church-Cooper amendment but said that Halperin's talk could make Senator Pearson favor the amendment.").

36. Letter from J. E. Hoover to H. R. Haldeman (Nov. 13, 1970), *id.* at 4 ("Halperin and [ ] also discussed a meeting which may take place this week to advise Senator Muskie concerning 'China policy.' "); Letter from J. E. Hoover to H. R. Haldeman (Dec. 17, 1970), *id.* (discussed "forthcoming trip by Senator Edmund Muskie to Russia and said Muskie was making the trip recommended by Clifford * *. He also mentioned that Averell Harriman was going with Muskie.").

37. An FBI letter to Kissinger on December 29, 1969 said that Halperin had discussed a proposed article in *Life Magazine* by Clark Clifford, former Secretary of Defense, on Vietnam. JA 64. The letter identified foreign policy statements by Nixon that Clifford intended to attack (*e. g.*, that President Thieu of South Vietnam "is one of the five greatest men of our time"; that "Vietnam is one of the finest hours in United States history"). The White House staff researched the alleged quotations, *see* Memorandum from Jim Keogh to Jeb Magruder (Jan. 12, 1970), JA 69, and Ehrlichman wrote to Haldeman, "This is the kind of early warning we need more of—your game planners are now in an excellent position to map anticipatory action." JA 70. The Clifford article never appeared.

38. Part of the relief granted in the District Court was an order that Halperin's security file be amended to include "a statement by Dr. Kissinger that the wiretap produced no information impugning either Dr. Halperin's loyalty or his discretion." *Halperin v. Kissinger, supra* note 5, 434 F.Supp. at 1196.

singer and Haig reviewed them.[39] Subsequently summary letters were sent to Kissinger, Nixon (through presidential counsel John Ehrlichman), and occasionally Mitchell.[40] As noted above, after May 1970 only Haldeman received the letters. When the surveillance was terminated the records were stored in a White House safe. The wiretap program first came to public attention in the 1973 espionage trial of Dr. Daniel Ellsberg, when the Government admitted that Ellsberg had been overheard by the FBI on Halperin's home telephone.[41] This suit was filed in June 1973, within a month of that disclosure.

## II. INDIVIDUAL RIGHTS AND NATIONAL SECURITY

 This case presents the conflict between the Government's need to act decisively to safeguard the nation's security and those individual rights that are implicated in any surveillance situation.[42] In such a case we must carefully consider any impact that our decision might have on the nation's ability to defend itself and its vital interests. Equally, as the Supreme Court has said, "It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties * * * which makes the defense of the Nation worthwhile." [43] Because of the significance of the competing interests at stake, we wish to consider their relationship before addressing the particular claims here.

Plaintiffs assert two intertwined constellations of personal rights: those revolving around privacy interests and those growing out of the First Amendment's guarantees of freedom of speech, press, association, and belief. The damage to privacy caused by Fourth Amendment violations was captured by Justice Brandeis' dissent in *Olmstead v. United States* : [44]

> [The Framers of the Constitution] conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment. * * *

The First Amendment buttresses the individual's protection against indiscriminate or unreasonable wiretapping. Such surveillance invades the citizen's constitutionally protected right to free private discussion,[45] and must inevitably chill public speech. Either result is intolerable.

In recent years both the Supreme Court [46] and Congress [47] have recognized the substantial injury to personal rights caused by unreasonable electronic surveillance. Although the technology of investigation has developed dramatically in the last century, the dangers of unwarranted governmental intrusion into citizens' private lives have

---

**39.** Letter from W. C. Sullivan to J. E. Hoover (May 20, 1969), JA 55.

**40.** *Halperin v. Kissinger, supra* note 4, 424 F.Supp. at 841.

**41.** *United States v. Russo and Ellsberg,* No. 9373 (C.D.Cal., Order of May 11, 1973). The Ellsberg prosecution, which followed public disclosure of the Pentagon Papers, was dismissed when the Government refused to produce the Halperin wiretap records.

**42.** *See United States v. United States District Court (Keith),* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

**43.** *United States v. Robel,* 389 U.S. 258, 264, 88 S.Ct. 419, 424, 19 L.Ed.2d 508 (1967).

**44.** 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

**45.** *See Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 415, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (First Amendment rights not lost because communication is private rather than public).

**46.** *See Berger v. New York,* 388 U.S. 41, 63, 87 S.Ct. 1873, 1885, 18 L.Ed.2d 1040 (1967) ("Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices."); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Keith, supra* note 42.

**47.** *See* 18 U.S.C. §§ 2511–2520 (1976) (Title III); Foreign Intelligence Surveillance Act of 1978, Pub. L. No. 95–511, 92 Stat. 1783.

not changed since Justice Bradley wrote in *Boyd v. United States* : [48]

It is not the breaking of [a man's] doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property * * *. * *

Without vigilant protection of a private space in which each citizen is free to pursue his own ideas and aspirations, we would betray our vision of a society based on the dignity of the individual.

The question presented by this case is when may these constitutional rights be overborne by the Executive to protect the security of the entire nation. Unfortunately, the inherent vagueness of the term "national security" hampers careful analysis.[49] All would agree that the term includes situations where the very existence of the Government is in jeopardy, but consensus may break down beyond such clear instances.

The Supreme Court has taken an extremely narrow view of the circumstances in which the Executive may exercise extraordinary powers under the Constitution. In *Mitchell v. Harmony* [50] the Court restricted the military's power to convert to its own use private property in a theatre of war.

[T]he danger must be immediate and impending; or the necessity urgent for the public service, such as will not admit of delay, and where the action of the civil authority would be too late in providing the means which the occasion calls for * * *. * * * [51]

This attitude was echoed in decisions striking down martial law in Indiana in 1864 [52] and in Hawaii in 1943.[53] In both cases the Supreme Court ruled that normal judicial processes may be superseded only when "foreign invasion" or "civil war" physically close the courthouses.[54] Similarly, in *Youngstown Sheet & Tube Co. v. Sawyer* [55] the Court found no basis in the Constitution for the President's seizure of steel mills during a wartime labor dispute, despite the President's claim that the war effort would be crippled if the mills were shut down.[56] Justice Jackson observed on that occasion that, because the drafters of the Constitution "suspected that emergency powers would tend to kindle emergencies," they "made no express provision for exercise of extraordinary authority because of a crisis." [57]

The Supreme Court's steadfast refusal to expand its view of emergency powers reflects an appreciation of the consequences of any national security exception to the usual constitutional limits on Executive conduct. The Court has not denied the

---

48. 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886).

49. *See Keith, supra* note 42, 407 U.S. at 314, 92 S.Ct. at 2135 ("The danger to political dissent is acute where the Government attempts to act under so vague a concept as the power to protect 'domestic security.' "); *id.* at 320, 92 S.Ct. at 2138 ("inherent vagueness of the domestic security concept"); *Zweibon v. Mitchell (Zweibon I),* 170 U.S.App.D.C. 1, 60–61, 516 F.2d 594, 653–654 (1975) *(en banc), cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).

50. 54 U.S. (13 How.) 115, 14 L.Ed. 75 (1851).

51. *Id.* at 134.

52. *Ex parte Milligan,* 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866).

53. *Duncan v. Kahanamoku,* 327 U.S. 304, 66 S.Ct. 606, 90 L.Ed. 688 (1946).

54. *Id.* 407 at 326, 92 S.Ct. 2125 (Murphy, J., concurring); *Ex parte Milligan, supra* note 52, 71 U.S. (4 Wall.) at 127.

55. 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

56. *Id.* at 587, 72 S.Ct. at 866 (Black, J.) ("It is clear that if the President had authority to issue the order he did, it must be found in some provision of the Constitution.").

57. *Id.* at 650, 72 S.Ct. at 877–878 (Jackson, J., concurring). *See also New York Times Co. v. United States,* 403 U.S. 713, 726, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Brennan, J., concurring); *Zweibon I, supra* note 49, 170 U.S.App.D.C. at 60 n.107, 516 F.2d at 635 n.107.

reality of dangers from foreign or internal conflicts. Rather, it has recognized the need to respect constitutional requirements even in troubled times. Security interests may be affected by fluctuations in international trade and the supply of natural resources, by social unrest at home and abroad, and by public disclosure of policy deliberations. But such events cannot routinely justify invasions of privacy or restrictions on expression without devaluing and eventually destroying those rights.

 We believe, therefore, that whatever special powers the Executive may hold in national security situations must be limited to instances of immediate and grave peril to the nation. Absent such exigent circumstances, there can be no appeal to powers beyond those enumerated in the Constitution or provided by law.[58] Any security

from one danger purchased with our individual rights would be but an illusion, for its price would be those protections against all other threats to our liberty.

### III. TITLE III AND THE FOURTH AMENDMENT

 Standards for evaluating the legality of this electronic surveillance derive from the Constitution and from Title III of the Omnibus Crime Control and Safe Streets Act of 1968.[59] The Government has conceded that the Fourth Amendment's ban on *unreasonable* searches and seizures applied to national security wiretaps in 1969,[60] but disputes the application of the Amendment's judicial warrant requirement.[61] The *Keith* Court observed that "the definition of 'reasonableness' turns, at least in part, on the more specific commands of the warrant

---

**58.** *See Zweibon I, supra* note 49, 170 U.S.App. D.C. at 56–57, 516 F.2d at 649–650; 18 U.S.C. § 2518(7) (1976). *See also Ex parte Milligan, supra* note 52, 71 U.S. (4 Wall.) at 120–121.

**59.** We are not concerned over the justiciability of this case. Although the Constitution exclusively commits the resolution of some questions to the Executive or Legislative Branches, here we are called on to determine whether electronic surveillance was consonant with statutory and constitutional strictures, a traditional judicial function that is governed by well established and manageable standards. *See* L. Tribe, American Constitutional Law 73 (1978). Decision of these appeals requires no initial policy decisions on how best to deal with the problem of Government leaks; nor need it entail any embarrassment to the Executive. Our course is reinforced by the Supreme Court's decision in *Keith, supra* note 42, which involved "the delicate question of the President's power, acting through the Attorney General, to authorize electronic surveillance in internal security matters without prior judicial approval." 407 U.S. at 299, 92 S.Ct. at 2128. There the Court proceeded immediately to resolution of the merits, rejected the contention that national security wiretaps involve factors "beyond the competence of courts to evaluate," *id.* at 319, 92 S.Ct. at 2138, *see Zweibon I, supra* note 49, 170 U.S.App.D.C. at 48–54, 516 F.2d at 641–647, and declined to carve out a national security exception to the warrant requirement of the Fourth Amendment.

Our duty to decide this case is not diminished because we deal with the President's foreign affairs power. The Supreme Court explicitly stated in *Baker v. Carr*, 369 U.S. 186, 211, 82

S.Ct. 691, 707, 7 L.Ed.2d 663 (1962), that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936) (the foreign affairs power "must be exercised in subordination to the applicable provisions of the Constitution"). Of course, the Executive's determination that national security was threatened in a particular situation is entitled to deference, *see United States v. Nixon*, 418 U.S. 683, 711–712, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), but "[E]xecutive action is not proof of its own necessity." *Duncan v. Kahanamoku, supra* note 53, 327 U.S. at 336, 66 S.Ct. at 621 (Stone, C.J., concurring).

**60.** Indeed, that was the Government's argument to this court in *Zweibon I, supra* note 49, 170 U.S.App.D.C. at 35, 516 F.2d at 628.

**61.** *Keith, supra* note 42, 407 U.S. at 314–321, 92 S.Ct. 2125; *Zweibon I, supra* note 49, 170 U.S. App.D.C. at 20–21, 516 F.2d at 613–614. *Keith* involved a "domestic security" threat posed by an American citizen suspected of planning disruptive actions, such as bombing, while *Zweibon I* concerned a "foreign security" danger resulting from anti-Soviet activities by the Jewish Defense League that might provoke Russian retaliation. *Keith* was a unanimous ruling, and six of the eight judges participating in *Zweibon I* agreed that the Fourth Amendment warrant requirement applied to that surveillance. The other two judges in *Zweibon I* would not have reached the Fourth Amendment issue in that case.

clause," [62] but warrantless searches have been approved in "certain carefully defined classes of cases." [63] Thus we must acknowledge that the Fourth Amendment's warrant requirement may not always apply, while a reasonableness standard may vary in different situations. [64] In contrast, Title III bans most electronic surveillance and specifies procedures for wiretapping and eavesdropping in particular situations; but the statute expressly does not limit the President's constitutional power to wiretap in national security situations. [65] Although the mandate of the statute is more precise, the reach of the constitutional provision may be seen as greater. [66]

To gauge the propriety of the Halperin surveillance under the overlapping constitutional and statutory standards, we must review the circumstances of the wiretapping and its connection to reasonable national security concerns. [67] If that connec-

tion is remote, or the supposed national security concerns ephemeral, we must remand to the District Court for a determination whether Title III should be applied; where the professed national security issues appear valid, we must still insist on compliance with the Fourth Amendment. We will first consider the applicability of Title III and then examine the requirements of the Fourth Amendment.

## A

Title III was designed to limit Government use of electronic surveillance techniques. According to the Supreme Court, the statute and legislative history "evince[ ] the clear intent to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications." [68] This

**62.** *Keith, supra* note 42, 407 U.S. at 315, 92 S.Ct. at 2135–36.

**63.** *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1731, 18 L.Ed.2d 930 (1967). *See, e.g., Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (search of federally regulated liquor dealer); *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (arresting officers may search area "within [the] immediate control" of suspect); *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (incipient crime).

**64.** *See Scott v. United States*, 436 U.S. 128, 139, 98 S.Ct. 1717, 1724, 56 L.Ed.2d 168 (1978) ("Because of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case."); *Keith, supra* note 42, 407 U.S. at 314, 92 S.Ct. at 2135 ("the Fourth Amendment is not absolute in its terms").

**65.** The plurality opinion in *Zweibon I, supra* note 49, 170 U.S.App.D.C. at 66–77, 516 F.2d at 659–670, concluded that although Title III did not affect presidential wiretapping *powers* in national security situations, some of the procedural and remedial provisions of the statute were relevant to unconstitutional surveillances in such instances. But our decision today in *Zweibon v. Mitchell (Zweibon III)*, 196 U.S. App.D.C. ——, —— ———, 606 F.2d 1172 (at 1200–1202, text at notes 52–60) 1181 (1979), restricts that particular conclusion to prospective effect. Since this case involves events from 1969 until 1971, only the constitutional procedures and remedies are relevant here.

**66.** Last year Congress enacted additional legislation explicitly covering national security surveillance involving foreign policy problems, Foreign Intelligence Surveillance Act of 1978, *supra* note 47, and repealing § 2511(3) of Title III, the pivotal statutory provision in this case. The 1978 statute does not control this case, however. That law expressly does not apply to surveillances that are terminated no more than 90 days after the Chief Justice designates the first judge to sit on a special court to review warrant applications under the new law. Foreign Intelligence Surveillance Act of 1978, 92 Stat. 1798, § 301.

**67.** That this relationship may be somewhat distant was conceded by defendant Kissinger in testimony before the Senate Foreign Relations Committee:

> [W]hen one is new in Government, leaks take on an extraordinary significance, because one has a sort of a tendency to think that a top secret paper is inviolate * * *.
>
> * * * * * *
>
> One has to be candid. This is sometimes out of proportion to the intrinsic damage that this particular leak may do, looked at in the long view. * * *

*Kissinger Hearings, supra* note 11, at 323.

**68.** *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 1826–27, 40 L.Ed.2d 341 (1974). *See Alderman v. United States*, 394 U.S. 165, 175, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969) ("The general rule under [Title III] is that official eavesdropping and wiretapping are permit-

court has observed that "[t]he Act's essential purpose * * * was to combine a limited and carefully articulated grant of power to intercept communications with an elaborate set of safeguards to deter abuse and to expunge its effects in the event that it should occur." [69]

The statute is straightforward. Section 2511 bans all electronic surveillance not authorized by Title III, with three exceptions not relevant to this case.[70] Surveillance is permitted for investigation of "classes of crimes carefully specified in 18 U.S.C. § 2516," [71] so long as stringent procedural requirements are satisfied.[72] The statute provides for civil as well as criminal prosecution of violators, with minimum civil damages set at $100 for each day of violation, plus punitive damages and attorney's fees.[73] A good faith defense is available to Government officials sued under Title III, as we discuss in detail in Part IV of this opinion.

The applicability of Title III to the Halperin wiretap hinges on Section 2511(3), which enumerates five national security situations in which surveillance would not be covered by the statute. This provision, as the *Keith* Court held, is an "expression of congressional neutrality" on national security surveillances:

> [N]othing in § 2511(3) was intended to *expand* or to *contract* or to *define* whatever presidential surveillance powers existed in matters affecting the national security. * * * [74]

Hence, if a surveillance falls under Section 2511(3), it is still subject to constitutional limitations, but not to Title III's requirements and prohibitions.

Only one of the five circumstances listed in Section 2511(3) might apply to this case: That nothing in Title III "shall limit the constitutional power of the President * * to protect national security information against foreign intelligence activities." [75] We face an initial problem in applying this provision to the instant case, since there was never any allegation that the Halperins were directly connected to "foreign intelligence activities." Although it is surely possible for vital secrets to be revealed through

---

ted only with probable cause and a warrant."); *United States v. Jones*, 542 F.2d 661, 671 (6th Cir. 1976) ("the pervasive theme of Title III [is] that electronic surveillance should be sharply curtailed and in no instance be undertaken without strict judicial authorization and supervision"); S. Rep.No. 1097, 90th Cong., 2d Sess. 66 (1968).

**69.** *In re Evans*, 146 U.S.App.D.C. 310, 314, 452 F.2d 1239, 1243 (1971), *cert. denied*, 408 U.S. 930, 92 S.Ct. 2479, 33 L.Ed.2d 342 (1972).

**70.** Those exceptions involve wiretapping by communications common carriers for billing and maintenance purposes, 18 U.S.C. § 2511(2)(a)(i) (1976), by the Federal Communications Commission in its regulatory capacity, *id.* § 2511(2)(b), and by prior consent of a party, *id.* § 2511(2)(c).

**71.** *Keith, supra* note 42, 407 U.S. at 301–302, 92 S.Ct. at 2129. Among the crimes for which surveillance under Title III may be authorized are espionage, sabotage, treason, labor racketeering, murder, kidnapping, robbery, extortion, bribery of public officials, obstruction of justice, gambling, and drug trafficking. 18 U.S.C. § 2516 (1976).

**72.** The warrant application must include "a full and complete statement of the facts and circumstances" showing the need for the wiretap

or eavesdropping, 18 U.S.C. § 2518(1)(b) (1976), an explanation of why other investigative procedures either have not been successful or are not appropriate, *id.* § 2518(1)(c), and an estimate of the period of surveillance, *id.* § 2518(1)(d). Government agents must minimize the intrusiveness of the surveillance and no warrant can extend for longer than 30 days. *Id.* § 2518(5). Finally, after the wiretapping or eavesdropping is terminated, all identifiable persons whose communications have been intercepted must be notified of the surveillance unless the investigators show good cause not to do so. *Id.* § 2518(8)(d).

**73.** *Id.* § 2520.

**74.** *Keith, supra* note 42, 407 U.S. at 308, 92 S.Ct. at 2132 (emphasis in original).

**75.** The other four circumstances are protection against "actual or potential attack or other hostile acts of a foreign power," obtaining "foreign intelligence information deemed essential to the security of the United States," and protection against either "overthrow of the Government by force or other unlawful means," or "any other clear and present danger to the structure or existence of the Government." 18 U.S.C. § 2511(3) (1976).

a leak to the press, both courts and Congress have looked for a direct link between the wiretap target and a foreign interest as a justification for surveillance.[76] In the absence of such a connection, we must closely scrutinize the validity of the national security rationale.[77]

The District Court declined to apply Title III because of "the indisputable difficulties and ambiguities presented by § 2511(3)."

> In view of the confused state of the law and the 30-year history of similar [warrantless national security wiretaps] * *, the Court finds that defendants' determination that Title III was inapplicable to the Halperin wiretap was reasonable during the period of surveillance. * * *[78]

This statement conflates the standards for a good faith defense with the applicability of Title III,[79] and reflects a fundamental misapprehension of the Halperins' position. They argue that the wiretap was not related to national security, and thus was subject to the substantive and procedural terms of Title III. If they are correct in their first contention, the second is incontestable. The "30-year history" of warrantless national security wiretaps could not affect the applicability of Title III to non-national security surveillances. Consequently, the proper inquiry for the District Court was whether the surveillance challenged here was a valid national security action.[80] To the extent that it was not, any uncertainty about the meaning of Section 2511(3) at the time of the wiretapping would be relevant only to the question of the defendants' official immunity to suit. As a result, we must reverse the grant of summary judgment on the statutory claim and remand for a determination by the District Court of whether the surveillance was reasonably intended to guard national security data from foreign intelligence agencies.

In this framework we see little evidence before us for classifying the surveillance from May 1970 to February 1971 as a national security action not reached by Title III. During those nine months Halperin had no official connection with the Government, and, in fact, had lacked access to much classified information for the preced-

---

**76.** *See, e. g., Keith, supra* note 42, 407 U.S. at 309, 92 S.Ct. at 2132 ("There is no evidence of any involvement, directly or indirectly, of a foreign power."); *Zweibon I, supra* note 49, 170 U.S.App.D.C. at 62, 516 F.2d at 655 (no Executive power for warrantless wiretapping "at least where the subject of the surveillance is a domestic organization that is not the agent of or acting in collaboration with a foreign power"); S. Rep.No. 1097, *supra* note 68, at 94 (discussing § 2511(3) in context of foreign security threats: cites members of Communist Party of the United States as "instruments of the foreign policy of a foreign power" and notes problem of "agents of foreign powers and those who cooperate with them"). The Foreign Intelligence Surveillance Act of 1978, *supra* note 47, specifies procedures for wiretapping and eavesdropping of "agents of a foreign power" and participants in terrorist acts. *Id.* § 101(b) & (c). The following striking passage appears in the House report on that legislation:

> It should be clear from the foregoing, but for the sake of explicitness the committee wishes to make perfectly clear, that *surveillance would not be authorized under this*, or any other definition of agent of a foreign power *against an American reporter merely because he gathers information for publica-*

*tion in a newspaper, even if the information was classified by the Government. Nor would it be authorized against a Government employee or former employee who reveals secrets to a reporter or in a book for the purpose of informing the American people.* * * *

H.R. Rep. No. 95–1283, Part I, 95th Cong., 2d Sess. 40 (1978) (emphasis added).

**77.** In view of the well-documented practice of classifying as confidential much relatively innocuous or noncritical information, *see* H.R. Rep. No. 93–221, 93d Cong., 1st Sess. 100 (1973), we cannot conclude automatically that revelation of all "top secret" documents will endanger national security. *See* note 67 *supra; see also New York Times Co. v. United States, supra* note 57, 403 U.S. at 719, 91 S.Ct. 2140 (Black, J.).

**78.** *Halperin v. Kissinger, supra* note 4, 424 F.Supp. at 842.

**79.** For discussion of good faith defense and absolute immunity issues, *see* Part IV *infra*.

**80.** *See Burkhart v. Saxbe,* 397 F.Supp. 499, 504 (E.D. Pa. 1975).

ing year; [81] a continuous, year-long wiretap had revealed no evidence that he was a leaker; and the reports on the wiretap were not sent to Kissinger, the President's National Security Adviser, but to Haldeman, a political and administrative adviser. Moreover, since Halperin had almost no official contact with the National Security Council from September 1969 to May 1970, the national security basis for surveillance during those nine months would seem almost equally attenuated. Finally, plaintiffs have raised questions about the purported national security nexus even at the beginning of the wiretap. Halperin claims that the surveillance was initiated for political reasons stemming from his connection to previous administrations. [82] He points to letters from Senator Goldwater to President Nixon and to Attorney General Mitchell recommending his ouster, [83] as well as to Kissinger's apparent request on June 4, 1969 that the surveillance be continued to establish "a pattern of innocence." [84] These events suggest, Halperin argues, that he was initially targeted for surveillance in order to bolster within the Nixon Administration the political credibility of Kissinger's staff appointments.

On remand the District Court must address all of these contentions. Title III will apply to any period during which the wiretap did not involve the primary purpose of protecting national security information against foreign intelligence activities. Where the parties have posed genuine issues of material fact, the court will have to undertake an evidentiary inquiry. Summary proceedings should be limited to those instances where the record before the court indicates no such issue. [85]

### B

Throughout the 21 months of the Halperin wiretap the defendants in this case were under an obligation to comply with both the reasonableness and the warrant requirements of the Fourth Amendment. The District Court found that at some point during the surveillance the wiretap

> developed into a dragnet which lacked temporal and spatial limitation. It represent[ed] the antithesis of the "particular, precise, and discriminate" procedures required by the Supreme Court in numerous Fourth Amendment cases. * * * [86]

81. The Government argues that since much of the information Halperin had access to in his previous jobs remained classified after he left the Government, he was still a potential leaker. Passing by the problem of overclassification of documents, *see* note 77 *supra,* we think this argument proves too much. It would justify surveillance of thousands of former federal employees without any further indication of security threat.

82. *See* note 15 *supra.* The second impeachment article approved by the House Judiciary Committee charged President Nixon with abusing the rights of private citizens by authorizing "Electronic Surveillance or Other Investigations for Purposes Unrelated to National Security, the Enforcement of Laws, or Any Other Lawful Function of His Office." H.R.Rep. No. 93–1305, 93d Cong., 2d Sess. 146 (1974). The Committee added in explanation that Nixon "falsely used a national security pretext to attempt to justify" improper surveillances. *Id.* The Committee also squarely concluded that the May 1969 wiretaps, including Halperin's, were established for "political purposes." *Id.* at 35.

83. JA 35–37.

84. Memorandum from A. Haig to H. Kissinger (June 4, 1969), JA 57.

85. Rule 56 of the Federal Rules of Civil Procedure directs that a motion for summary judgment must be granted if the materials submitted to the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Mazaleski v. Treusdell,* 183 U.S.App.D.C. 182, 188, 562 F.2d 701, 717 (1977); *Askew v. Bloemker,* 548 F.2d 673, 679 (7th Cir. 1976). *See also* text at notes 113–118 *infra.*

In view of the extensive discovery that has taken place in this case, the District Court may well be able to resolve remanded questions without reopening the record. It remains in the court's discretion, naturally, to receive additional submissions as necessary.

86. *Halperin v. Kissinger, supra* note 4, 424 F.Supp. at 843 (*citing Osborn v. United States,* 385 U.S. 323, 329–330, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); *Berger v. New York, supra* note 46, 388 U.S. at 55–60, 87 S.Ct. 1873, 18 L.Ed.2d 1040; *Katz v. United States, supra* note 46, 389 U.S. at 354–357, 88 S.Ct. 507, 19 L.Ed.2d 576).

Although we agree that the surveillance did not satisfy the reasonableness standard, we must remand for consideration both of the warrant question and of *when* the wiretap became unreasonable. In addition, we cannot affirm the award of $1 nominal damages for the constitutional violations established here.

1. When the Supreme Court first applied the warrant provision of the Fourth Amendment to wiretapping in 1967, it expressly reserved the question of prior judicial approval of national security surveillances.[87] In *Keith,* however, the Court found that a warrant was necessary before a domestic target deemed a threat to national security could be wiretapped, and in *Zweibon I* this court ruled that a warrant was needed to wiretap a domestic group that may be concerned with foreign affairs but "that is not the agent of or acting in collaboration with a foreign power * *."[88] At the root of these decisions was the conviction that prior judicial approval of wiretapping for national security matters, absent exigent circumstances, falls within the competence of the judiciary,[89] poses no additional threat to national security,[90] and provides a valuable check on Executive discretion.[91]

■ For the reasons articulated in our opinion today in *Zweibon v. Mitchell (Zweibon III),*[92] we conclude that a warrant was required for the Halperin wiretap in May 1969. The reasoning of both *Keith* and *Zweibon I,* which dealt with wiretaps initiated during the same period, applies with equal force to this situation, and there is no basis for limiting those cases to prospective effect. The District Court in the instant case "[a]ssum[ed] *arguendo*" that defendants were not subject to the warrant requirement, although it is not clear from that opinion whether the assumption was based on retroactivity considerations or defendants' possible immunity from suit.[93] In any event, such an assumption for purposes of argument is no substitute for a specific holding by the District Court. Of course, the defendants may be able to make out an immunity defense by arguing that due to uncertainty in the law on the warrant requirement there were reasonable grounds in 1969 for their failure to acquire a warrant, and that they did not act in bad faith.[94] This is a distinct question, however, from whether the Fourth Amendment mandated a warrant.

2. As we discussed above, we believe that Title III most likely should apply to at least part of the period of the Halperin surveillance. Nevertheless, for any period during which the District Court concludes that the surveillance was genuinely based on national security concerns, the wiretap might still have violated the Fourth Amendment's reasonableness standard.[95] The duration or conduct of the surveillance might well be deemed to have been unreasonable in view of the likely product of the wiretap, especially after the initial period. In that event, the trial court would have to establish the time span of that constitution-

**87.** *Katz v. United States, supra* note 46, 389 U.S. at 358 n.23, 88 S.Ct. at 515 ("Whether safeguards other than prior authorization by a magistrate would satisfy the Fourth Amendment in a situation involving the national security is a question not presented by this case.").

**88.** *Zweibon I, supra* note 49, 170 U.S.App.D.C. at 62, 516 F.2d at 655.

**89.** *Keith, supra* note 42, 407 U.S. at 320, 92 S.Ct. 2125; *Zweibon I, supra* note 49, 170 U.S. App.D.C. at 48–54, 516 F.2d at 641–647.

**90.** *Keith, supra* note 42, 407 U.S. at 320–321, 92 S.Ct. 2125; *Zweibon I, supra* note 49, 170 U.S. App.D.C. at 54–55, 516 F.2d at 647–648.

**91.** *Keith, supra* note 42, 407 U.S. at 316–317, 92 S.Ct. 2125; *Zweibon I, supra* note 49, 170 U.S. App.D.C. at 40–43, 516 F.2d at 633–636.

**92.** 196 U.S.App.D.C. ——, 606 F.2d 1172 (1979).

**93.** *See Halperin v. Kissinger, supra* note 4, 424 F.Supp. at 842–843.

**94.** *See* Part IV *infra.*

**95.** The constitutional remedy would be relevant only if the more specific procedures and remedies of Title III were not applicable. Of course, the constitutional and statutory remedies could not be granted simultaneously.

al violation in order to determine damages.[96]

**3.** Damage suits for the vindication of individual rights date from the eighteenth century in England,[97] and have been widely recognized in our courts.[98] The Supreme Court stated in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, "[D]amages have been regarded as the ordinary remedy for an invasion of personal interests in liberty."[99] The instant suit is squarely within this tradition, and the Halperins are "entitled to recover money damages for any injuries [they have] suffered as a result of the * * * violation of the [Fourth] Amendment."[100]

Even if a constitutional violation inflicts only intangible injury, compensation is still appropriate. In *Paton v. LaPrade* the Third Circuit enumerated many of the intangible injuries that might have been suffered by a student unreasonably investigated by the FBI: "stigmatization, invasion of privacy, interference with personality development, and interference with her freedom of association through the decision of others to shun her."[101] This approach has been followed by other circuits in suits alleging constitutional violations by state officials under 42 U.S.C. § 1983 (1976).[102]

Due to the plaintiffs' reliance on a "presumption" of injury in requesting a damage award, the District Court concluded that there was "no demonstrable injury."[103] We

**96.** Although the plurality in *Zweibon I, supra* note 49, found that some of the procedures and the civil damages provision of Title III should apply to unconstitutional wiretaps in national security situations, our ruling in *Zweibon III, supra* note 65, restricts that position to prospective effect. As a result, the District Court in this case will have to consider compensatory damages for any unconstitutional surveillance. *See also* note 106 *infra*.

**97.** *See Entick v. Carrington,* 95 Eng.Rep. 807, 19 How.St.Tr. 1030 (1765) (unlawful search by King's officers); *Wilkes v. Wood,* 98 Eng.Rep. 489, 19 How.St.Tr. 1075 (1763) (same).

**98.** *See, e. g., Nixon v. Condon,* 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932) (recognizing damage remedy in civil suit alleging wrongful denial of right to vote); *Wayne v. Venable,* 260 F. 64 (8th Cir. 1919) (same).

**99.** 403 U.S. 388, 395, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971). In Justice Harlan's pithy phrase, "For people in Bivens' shoes, it is damages or nothing." *Id.* at 410, 91 S.Ct. at 2012 (Harlan, J., concurring).

**100.** *Id.* at 397, 91 S.Ct. at 2005. In *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Supreme Court ruled that in the absence of proof of injury plaintiffs alleging violation of procedural due process rights may win only nominal damages. We think that holding does not require a similar award to the Halperins for two reasons. First, the Court emphasized that the "prerequisites for recovery of damages appropriate to compensate injuries caused by the deprivation of one constitutional right are not necessarily appropriate to compensate injuries caused by the deprivation of another." *Id.* at 264–265, 98 S.Ct. at 1053. The due process issue in *Piphus* concerned a student's right to a pre-suspension hearing, so

it would indeed have been difficult to estimate the plaintiff's injury unless he could have shown that he would not have been suspended if a hearing had been held. The substantive rights asserted by the Halperins are of a much different character, as is evident from the traditional damage remedy for unlawful search marked by the English cases of *Entick* and *Wilkes, supra* note 97, and our *Bivens* doctrine. *See Carey v. Piphus, supra,* 435 U.S. at 264–265, 98 S.Ct. 1042 (distinguishing cases involving "denial of Fourth Amendment rights"). Second, the Supreme Court ruled that the plaintiff in *Piphus* might still prove actual injury but simply could not claim a presumption of injury. *Id.* at 262–264, 98 S.Ct. 1042. To the extent that the plaintiffs here can establish actual though intangible injury, damages would clearly be appropriate even under *Piphus.*

**101.** 524 F.2d 862, 871 (3d Cir. 1975). Because it involved First Amendment and privacy rights, *id.* at 869–870, *Paton* is not limited by the Supreme Court's *Piphus* ruling. *See* note 100 *supra.*

**102.** *See, e.g., Seaton v. Sky Realty Co.,* 491 F.2d 634, 636–638 (7th Cir. 1974); *Donovan v. Reinbold,* 433 F.2d 738, 743 (9th Cir. 1970).

**103.** *Halperin v. Kissinger, supra* note 5, 434 F.Supp. at 1195. Plaintiffs attribute their course to a pre-*Piphus* belief that injury should be presumed, based on the lower court rulings in *Piphus v. Carey,* 545 F.2d 30 (7th Cir. 1976), and *Hostrop v. Board of Junior College District No. 515,* 523 F.2d 569 (7th Cir. 1975), *cert. denied,* 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976). *See* note 100 *supra.* We see no reason why, on remand, they should not be permitted to amend their pleadings and attempt to demonstrate injury.

think that conclusion neglected the possibility that plaintiffs might show loss due to emotional distress and mental anguish, traditional bases for tort recovery. Such harm might be demonstrated through direct testimony of the plaintiffs or might be "inferred from the circumstances," [104] and if established would surely entitle the Halperins to more than nominal recovery. This court has held that in cases involving constitutional rights, compensation "should not be approached in a niggardly spirit. It is in the public interest that there be a reasonably spacious approach to a fair compensatory award for denial or curtailment of the right * * *." [105] Specifying such damages will always be difficult, but they must be at least "an amount which will assure [the plaintiff] that [personal] rights are not lightly to be disregarded and that they can be truly vindicated in the courts." [106]

## IV. THE IMMUNITY DEFENSE

■ All individual defendants claim an absolute immunity from civil damage suits for actions undertaken in their official capacities. The District Court rejected these claims, and we agree with that ruling. Defendants, including former President Nixon, are entitled to a qualified immunity on both the Fourth Amendment and the Title III claims if they can show that they had rea-

sonable grounds for believing their actions were legal (the "objective" basis) and that there was no malice or bad faith in either the initiation or the conduct of the wiretapping (the "subjective" basis). [107] Because former President Nixon advances particular arguments in support of his own absolute immunity, we will consider his status separately.

### A

■ Officials making adjudicative and prosecutorial decisions are absolutely immune from civil suit based on such actions. This doctrine assumes that the initiation of a prosecution and the resolution of a dispute are especially likely to incite individualized wrath, [108] and that the review processes of the judicial system provide an automatic safeguard against improper actions. [109] Absolute immunity is not available, however, for those same officials for acts not involving adjudication or prosecution. [110]

In *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Supreme Court outlined two bases for qualifying the immunity from suit enjoyed by Executive officials: (1) without such qualification the damage actions contemplated by *Bivens* would be "drained of meaning" and many constitutional violations would go un-

---

104. *Seaton v. Sky Realty Co., supra* note 102, 491 F.2d at 637–638.

105. *Tatum v. Morton,* 183 U.S.App.D.C. 331, 334, 562 F.2d 1279, 1282 (1977) (First Amendment claim).

106. *Id.,* 183 U.S.App.D.C. at 339, 562 F.2d at 1287 (Wilkey, J., concurring). Although not directly controlling for Fourth Amendment violations, *see* note 65 *supra,* it is certainly illuminating that Congress in Title III identified $100 a day as the proper award for victims of unlawful wiretapping. *See* 18 U.S.C. § 2520 (1976). One would expect substantial correspondence between that legislatively established figure for compensation and the amount appropriate for Fourth Amendment violations involving similar harms flowing from similar actions.

107. *See Zweibon, I, supra* note 49, 170 U.S. App.D.C. at 77–80, 516 F.2d at 670–673.

108. *Butz v. Economou,* 438 U.S. 478, 509–510, 512, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Im-*

*bler v. Pachtman,* 424 U.S. 409, 424–426, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

109. *Butz v. Economou, supra* note 108, 438 U.S. at 512, 98 S.Ct. 2894; *Imbler v. Pachtman, supra* note 107, 424 U.S. at 427, 96 S.Ct. 984; *see also Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). *See generally Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978).

110. Although defendant Mitchell might be entitled to prosecutorial immunity for some of his actions as Attorney General, this is not such a case since there is no allegation that the Halperin surveillance was part of a criminal prosecution. *See Forsyth v. Kleindienst,* 599 F.2d 1203, 1214–1215 (3d Cir. 1979); *Apton v. Wilson,* 165 U.S.App.D.C. 22, 32, 506 F.2d 83, 93 (1974); *Briggs v. Goodwin,* 186 U.S.App.D.C. 179, 569 F.2d 10 (1977), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978).

remedied;[111] and (2) since state officials may be held liable for such violations,[112] it would "stand the constitutional design on its head" if the courts established "a system in which the Bill of Rights monitors more closely the conduct of state officials than it does that of federal officials * * *."[113]

The *Economou* Court adopted for federal officials the objective and subjective standards for qualified immunity of *Wood v. Strickland*:[114]

[An official is] not immune * * * [A] if he knew or reasonably should have known that the action he took * * * would violate the constitutional rights of the [person] affected, or [B] if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury * * *. * * *

We stress that only one of these two standards need be satisfied in order for a defendant to lose his immunity from suit.[115]

To reduce the potential for harassment of Executive officials, the Su-

preme Court has recommended resolution of the immunity issue, when possible, on summary judgment.[116] This course is best suited for handling the objective basis for qualified immunity. Courts should be able to determine at the pretrial stage whether there is a genuine issue of material fact as to the reasonableness of a defendant's belief that he was acting legally. On the subjective criterion—which "turns on officials' knowledge and good faith belief"[117] —summary action may be more difficult. Questions of intent and subjective attitude frequently cannot be resolved without direct testimony of those involved.[118] Nevertheless, in view of the Supreme Court's emphasis on the importance of summary procedures in suits like this one, District Courts must carefully examine any pretrial claim by a defendant that a plaintiff has not raised a genuine issue of material fact as to defendant's subjective good faith.[119] Should the court conclude on the record before it that the defendant is not entitled to a judgment as a matter of law,[120] the

111. 438 U.S. at 501, 98 S.Ct. 2894.

112. *See* 42 U.S.C. § 1983 (1976).

113. *Butz v. Economou, supra* note 108, 438 U.S. at 504, 98 S.Ct. at 2909–10.

114. 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). *See Procunier v. Navarette,* 434 U.S. 555, 562, 565–566, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Pierson v. Ray, supra* note 109, 386 U.S. at 557, 87 S.Ct. 1213.

115. We follow the holding in *Zweibon I, supra* note 49, 170 U.S.App.D.C. at 77–78, 516 F.2d at 670–671, that the good faith defense specified in § 2520 of Title III, 18 U.S.C. § 2520 (1976), is the same as in constitutional cases. Because Judge Robb concurred in the plurality's position on this point, 170 U.S.App.D.C. at 95, 516 F.2d at 688, that holding was reached by a majority of this court.

116. *Butz v. Economou, supra* note 108, 438 U.S. at 508, 98 S.Ct. 2894.

117. *Apton v. Wilson, supra* note 110, 165 U.S. App.D.C. at 34, 506 F.2d at 95.

118. *See Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) (summary judgment "should be used sparingly * * * where motive and intent play leading roles, the proof is

largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot"). For application of this principle to cases involving constitutional claims, *see* cases cited in note 85 *supra. See also Paton v. LaPrade, supra* note 101, 524 F.2d at 872; *Abramson v. Mitchell,* 459 F.2d 955 (8th Cir. 1972).

119. A formulation of the summary judgment standard in a similar context was offered by the Seventh Circuit in *Askew v. Bloemker, supra* note 85, 548 F.2d at 679, involving a suit against state officials for violation of Fourth Amendment rights:

Plaintiffs are entitled to take to the jury the state-of-mind defense on which the defendants herein rely as long as plaintiffs have adduced specific facts from which a reasonable man, viewing all the evidence in the light most favorable to plaintiffs and resolving all testimonial conflicts in the same manner, could infer that the defendants were acting * * * in bad faith * * *.

Of course, at the pleading stage plaintiffs must allege that the defendants acted with "malicious intention" in order to proceed with a claim that immunity should be denied on the subjective criterion. *Procunier v. Navarette, supra* note 114, 434 U.S. at 561, 98 S.Ct. 855.

120. Since pretrial discovery has concluded in this case, *see* note 85 *supra,* we do not attempt to sketch comprehensive standards guiding the

court must move beyond summary procedures.[121] At trial defendants would have to establish their subjective good faith as an affirmative defense.[122]

As to defendants Mitchell and Haldeman, the District Court found "their activities relating to the wiretap *continuance* unreasonable." [123] On the subjective claim, the court noted:

> The evidence here reflects a twenty-one month wiretap continuance without fruits or evidence of wrongdoing, a failure to renew or evaluate the material obtained, a lack of records and procedural compliance, a seemingly political motive for the later surveillance and dissemination of reports, and an apparent effort to conceal the wiretap documents.[124]

The District Court also applied the objective standard, finding that the defendants violated the Fourth Amendment, and, "[l]ike any other citizen, these officials are charged with knowledge of established law and must be held accountable for personal misconduct." [125]

We find no basis for disturbing these rulings. Certainly there were no reasonable grounds for believing that the continuing surveillance was in accord with the Constitution, and the record contains ample support for the trial court's ruling on bad faith. Under the terms of our remand, however, the District Court will also have to consider any claim by defendants that they are immune from liability for their failure to acquire a warrant for the wiretap, a question which the District Court has not directly addressed.[126] In a complex case like this one, the District Court must undertake a particularized inquiry into the immunity available for each alleged type or period of constitutional or statutory violation in order to safeguard both the individual rights asserted by the Halperins and the freedom of Executive officials to act.

## B

In order to accept defendant Nixon's argument that he, as a former President, is absolutely immune from this suit, we would have to hold that his status as President sets him apart from the other high Executive officials named as defendants to this action. Such a distinction would have to rest on a determination ei-

discretion of District Judges faced with requests to permit detailed discovery of the mental processes and confidential discussions of Executive decisionmakers. We advert to the problem only because we believe close control of discovery in suits against such officials is essential to the preservation of meaningful official immunity. *See United States v. Nixon, supra* note 59, 418 U.S. at 703–713, 94 S.Ct. 3090 (recognizing a presumptive privilege for confidential conversations between a President and his close advisors, but finding that general interest to be overborne by a specific showing of need for such evidence in a pending criminal trial); *United States v. Reynolds,* 345 U.S. 1, 6–12, 73 S.Ct. 528, 97 L.Ed. 727 (1953) (military secrets); *cf. United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941) (mental processes of administrative decisionmakers). Where a showing of need has prevailed over a broad claim of privilege, a District Court might be well advised to require that inquiries first be made of subordinate officials before sanctioning discovery that imposes on the time of high-level officials.

121. *Apton v. Wilson, supra* note 110, 165 U.S. App.D.C. at 33–34, 506 F.2d at 94–95. Judge Gesell in his concurrence has highlighted the central problem posed by the post-*Economou*

immunity doctrine: How to make effective the use of summary procedures in preventing harassment of Executive officials. We believe that the approach we take here conforms with the requirements of Rule 56 of the Federal Rules of Civil Procedure, and with the concerns of the *Economou* Court for the interests of both potential plaintiffs and potential defendants.

122. *See Zweibon I, supra* note 49, 170 U.S.App. D.C. at 14 n.18, 516 F.2d at 607 n.18.

123. *Halperin v. Kissinger, supra* note 4, 424 F.Supp. at 845 (emphasis added).

124. *Id.*

125. *Id.*

126. On the District Court's treatment of the Fourth Amendment warrant requirement, *see* 196 U.S.App.D.C., at ——, 606 F.2d 1206–1207 *supra.* In addition, the warrant provision of Title III might also be relevant to this case if the District Court determines on remand that there was no national security basis for the initiation of the wiretap. *See* 196 U.S.App. D.C., at ——, 606 F.2d at 1205, *supra.*

ther that the Constitution impliedly exempts the President from all liability in cases like this or that the repercussions of finding liability would be drastically adverse. Because we are unable to make that distinction, we do not believe he is entitled to absolute immunity to a damage action by a citizen subjected to an unconstitutional or illegal wiretap.

1. The constitutional scheme betrays no indication that any kind of immunity was intended for the President or the Executive Branch. While congressmen enjoy the privileges of the Speech and Debate Clause of Article I,[127]

> [t]he Constitution makes no mention of special presidential immunities. Indeed, the Executive Branch generally is afforded none. This silence cannot be ascribed to oversight. * * * [128]

In addition, there are indications that the Constitutional convention was presented with the question of Executive privileges and chose not to grant any.[129] The Convention did specify, however, that an impeached President may still be tried in the courts for any offense.[130]

By contemplating the possibility of post-impeachment trials for violations of law committed in office, the Impeachment Clause itself reveals that incumbency does not relieve the President of the routine legal obligations that confine all citizens. * * * [131]

 2. The doctrine of separation of powers wisely counsels the judiciary to act with care when reviewing actions by other branches, but the courts may not evade their constitutional responsibility to delineate the obligations and powers of each branch. Thus, although courts lack power to grant injunctive relief against prospective presidential actions that may be discretionary,[132] Presidents are scarcely immune from judicial process. Courts have intervened in defense of congressional lawmaking prerogatives to block improper presidential exercise of emergency powers [133] and to assert the President's duty to execute mandatory legislative instructions.[134] They have also ordered production of presidential documents needed for orderly functioning of the criminal justice system.[135] Clearly, a proper regard for separation of powers does not require that the

127. U.S.Const., Art. I, § 6, cl. 1.

128. *Nixon v. Sirica,* 159 U.S.App.D.C. 58, 69, 487 F.2d 700, 711 (1973) (*en banc*).

129. At one point in the Convention's deliberations, James Madison suggested "the necessity of considering what privileges ought to be allowed to the Executive," 2 M. Farrand, The Records of the Federal Convention of 1787, 503 (1911), but the proposal was not taken up. Charles Pinckney, who was intimately involved in consideration of the privileges question, *see id.* at 502; 3 *id.* at 605–606, explained to the United States Senate in 1800 why Madison's suggestion went unheeded:

> . . . Let us inquire, why the Constitution should have been so attentive to each branch of Congress, so jealous of their privileges, and have shewn so little to the President of the United States in this respect. . . . No privilege of this kind was intended for your Executive, nor any except that which I have mentioned [speech and debate] for Legislature. The Convention which formed the Constitution well knew that this was an important point, and no subject had been more abused than privilege. They therefore determined to set the example, in merely limiting

privilege to what was necessary, and no more.
3 *id.* at 385.

130. U.S.Const., Art. 1, § 3, cl. 7.

131. *Nixon v. Sirica, supra* note 128, 159 U.S. App.D.C. at 69, 487 F.2d at 711. In *United States v. Nixon, supra* note 59, the Supreme Court acknowledged a limited Executive privilege of confidentiality, 418 U.S. at 706–707, 94 S.Ct. 3090, but that conclusion was based on practical considerations of government, not constitutional text. We review the likely practical effect of our ruling today in text at notes 137–141 *infra.*

132. *See Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 18 L.Ed. 437 (1866); *see also Georgia v. Stanton,* 73 U.S. (6 Wall.) 50, 18 L.Ed. 721 (1867).

133. *Youngstown Sheet & Tube Co. v. Sawyer, supra* note 55.

134. *Nat'l Treasury Employees Union v. Nixon,* 160 U.S.App.D.C. 321, 492 F.2d 587 (1974).

135. *United States v. Nixon, supra* note 59.

courts meekly avert their eyes from presidential excesses while invoking a sterile view of three branches of government entirely insulated from each other.[136] Such an abdication of the judicial role would sap the vitality of the constitutional rights whose protection is entrusted to the judiciary.

3. We also find no basis for absolute presidential immunity on what might be termed prudential grounds. We do not believe that any inhibiting effect such suits might have on the presidential will to act should hinder effective governance of the nation. To some extent, of course, the denial of absolute immunity is intended to affect Executive behavior that threatens to violate constitutional rights. We believe, however, that suits that may successfully be pursued against a President will be quite rare.[137] And if we are serious about providing a remedy for constitutional violations, there can be no rational basis, as the *Economou* Court emphasized, for holding inferior officials liable for constitutional violations while immunizing those higher up.

> Indeed, the greater power of such [higher] officials affords a greater potential for a regime of lawless conduct. Extensive Government operations offer opportunities for unconstitutional action on a massive scale. * * * [138]

In addition, the doctrine of qualified immunity, as elaborated by the Supreme Court in *Scheuer v. Rhodes* and by this court in *Apton v. Wilson,* makes allowance for the additional demands on the time and attention of a Chief Executive.[139] The President, like all citizens, must be held to know the relevant law, but he "may be entitled to consult fewer sources and expend less effort inquiring into the circumstances of a localized problem." [140] This sliding scale would apply with even greater force if the President were acting in an emergency situation. The President would lose his immunity only if plaintiffs could

---

**136.** *See Youngstown Sheet & Tube Co. v. Sawyer, supra* note 55, 343 U.S. at 635, 72 S.Ct. at 870 (Jackson, J., concurring) ("While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity."). *See also id.* at 610, 72 S.Ct. 863 (Frankfurter, J., concurring). Judge McGowan has articulated an approach to separation of powers questions that respects both the separateness and the interdependence of the three branches:

> [S]eparation of powers questions are to be resolved by analyzing with particularity the extent to which an act by one branch prevents another from performing its assigned duties and disrupts the balance among the coordinate departments of government. To the extent such interference is perceived, the inquiry must then shift to considering whether the impact of an Act on one branch of government is justified by the need to pursue objectives whose promotion is assigned by the Constitution to a different branch. * *

*Nixon v. Administrator of General Services,* 408 F.Supp. 321, 342 (D.D.C.1976) (three-judge court), *aff'd,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977).

**137.** *Cf. Dellums v. Powell,* 182 U.S.App.D.C. 244, 249, 561 F.2d 242, 247, *cert. denied,* 434 U.S. 880, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977)

(permitting civil damage action for constitutional deprivation despite disruption of presidential confidentiality, partly because "the infrequent occasions of such disclosure militate against any substantial fear that the candor of Presidential advisers will be imperiled").

**138.** *Butz v. Economou, supra* note 108, 438 U.S. at 506, 98 S.Ct. at 2910.

**139.** *Scheuer v. Rhodes,* 416 U.S. 232, 247–249, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Apton v. Wilson, supra* note 110, 165 U.S.App.D.C. at 30–31, 506 F.2d at 91–92. In *Scheuer v. Rhodes* the Supreme Court stressed the "virtually infinite" range of decisions and choices that may face a Chief Executive in a situation:

> [S]ince the options which a chief executive and his principal subordinates must consider are far broader and far more subtle than those made by officials with less responsibility, the range of discretion must be comparably broad. * * *

416 U.S. at 247, 94 S.Ct. at 1692. As this court has stated, such concerns "go to the showing an officer vested with a qualified immunity must make in support of 'good faith belief;' they do not make the qualified immunity itself inappropriate." *Apton v. Wilson, supra* note 110, 165 U.S.App.D.C. at 32, 506 F.2d at 93.

**140.** *Apton v. Wilson, supra* note 110, 165 U.S. App.D.C. at 32, 506 F.2d at 93.

show that he acted with "actual malice" [141] or that he failed to meet a statutory or constitutional obligation that was clear under the circumstances as understood at the time.[142] Under this approach plaintiffs would have substantial difficulty in defeating a President's claim of immunity, an outcome that helps satisfy our concern that suits like this one would place major and unwarranted demands on a President's time. In considering the case to be made out by plaintiffs before trial,[143] District Courts should be sensitive to the extraordinary practical difficulties confronting a President who is charged in such a suit.[144]

4. We do not think that the personal burden on the President of having to answer civil suits like this one is so great as to justify absolute immunity. Like other Executive officials, he is represented by the Government if he is sued for his official actions,[145] and there seems to be no basis for greater solicitude for the personal finances of a President ordered to pay damages for his constitutional violations than for a governor or a cabinet officer.[146]

Finally, we think the application of qualified immunity to defendant Nixon is mandated by our tradition of equal justice under law. The President is the elected chief executive of our government, not an omniscient leader cloaked in mystical powers. This court has observed that "[s]overeignty remains at all times with the people, and they do not forfeit through elections the right to have the law construed against and applied to every citizen." [147] The Supreme Court noted this truth in *Economou* when it quoted from *United States v. Lee* : [148]

> "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All officers of the government, from the highest to the least, are creatures of the law, and are bound to obey it.[149]

---

**141.** See *Wood v. Strickland, supra* note 114, 420 U.S. at 321, 95 S.Ct. 992.

**142.** See *Scheuer v. Rhodes, supra* note 139, 416 U.S. at 246–247, 94 S.Ct. 1683, 40 L.Ed.2d 90.

**143.** See text at notes 119–122 *supra.*

**144.** Stressing the crucial importance to democratic government of independent lawmakers, the Supreme Court has recognized an absolute immunity for state and local legislators which parallels the protection afforded to federal lawmakers by the Speech and Debate Clause of the Constitution. Such immunity, the Court has said, spares the legislators the "cost and inconvenience and distractions" of a public trial, and protects them from speculation by a finder of fact as to their motives for legislative actions. *Tenney v. Brandhove,* 341 U.S. 367, 377, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); *Lake County Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). Taken in the abstract, these considerations might seem to support absolute immunity for the President, or, indeed, for any Executive official. We do not, however, find them compelling here. *Scheuer v. Rhodes, supra* note 139, and *Butz v. Economou, supra* note 108, establish that high Executive officials in state or federal positions do not enjoy the same immunity as lawmakers do. Because no defensible distinction can be made between the President and other high Executive officers for immunity purposes, we find no basis for applying to the President the absolute immunity of legislators.

**145.** 28 C.F.R. §§ 50.15–50.16 (1978). Representation may be denied if the Department of Justice determines "that it is not in the interest of the United States to represent the employee." *Id.* § 50.15(b)(4). *See also* 28 U.S.C. § 516 (1976).

**146.** Legislation is currently pending in Congress that would provide a cause of action against the federal government for individuals harmed by officials acting in the course of duty. H.R. 193, 96th Cong., 1st Sess. (1979). A similar measure was the subject of hearings in the last Congress and was favorably reported by the subcommittee considering it. *Federal Tort Claims Act: Hearings on H.R. 9219 Before the Subcommittee on Administrative Law and Government Relations of the House Judiciary Committee,* 95th Cong., 2d Sess. (1978). By waiving sovereign immunity against *Bivens* suits, such legislation would divert litigation from individual officials.

**147.** *Nixon v. Sirica, supra* note 128, 159 U.S. App.D.C. at 69, 487 F.2d at 711.

**148.** 106 U.S. (16 Otto) 196, 220, 1 S.Ct. 240, 27 L.Ed. 171 (1882).

**149.** *Butz v. Economou, supra* note 108, 438 U.S. at 506, 98 S.Ct. at 2910–11.

## V. KISSINGER'S SUMMARY JUDGMENT MOTION

██ The District Court granted summary judgment in favor of defendant Kissinger on the ground that he played an "inactive role" in the surveillance and lacked "oversight authority."[150] We think this ruling was error, since plaintiffs raised genuine issues of material fact as to Kissinger's role in the installation and maintenance of the wiretap.[151] They demonstrated that Kissinger was involved to some extent in the decision to initiate a surveillance program,[152] that he monitored the product of the surveillance for a full year,[153] and that on at least one occasion he directly requested continuation of the Halperin tap.[154]

We, of course, intimate no suggestion as to Kissinger's liability, but only hold that plaintiffs made a sufficient showing as to his supervisory role to survive a motion for summary judgment.

Accordingly, the judgment of the District Court is reversed and this case is remanded for proceedings not inconsistent with this opinion.

*Reversed and remanded.*

GESELL, District Judge, concurring:

I concur in the foregoing opinion except as indicated below.

This suit against a President of the United States and high cabinet-level officials brings into sharp focus the practical difficulties presented by the intimation in *Butz v. Economou*, 438 U.S. 478, 508, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), which is today accepted by this Court, that the objective and subjective good faith components of the qualified immunity defense can usually be resolved without trial by summary judgment after pretrial discovery. The majority is willing to extend no more protection to top federal officials than is afforded by the normally applicable summary judgment principles. As I see it, this means that if a plaintiff can establish a genuine material issue of fact as to any element of the immunity defense the case will have to proceed to trial. In my view this approach substantially undermines, if not destroys, the immunity doctrine.

We should not close our eyes to the fact that with increasing frequency in this jurisdiction and throughout the country plaintiffs are filing suits seeking damage awards against high government officials in their personal capacities based on alleged constitutional torts. Each such suit almost invariably results in these officials and their colleagues being subjected to extensive discovery into traditionally protected areas, such as their deliberations preparatory to the formulation of government policy and their intimate thought processes and communications at the presidential and cabinet levels. Such discover is wide-ranging, time-consuming, and not without considerable cost to the officials involved. It is not difficult for ingenious plaintiff's counsel to create a material issue of fact on some element of the immunity defense where subtle questions of constitutional law and a decisionmaker's mental processes are involved. A sentence from a casual document or a difference in recollection with regard to a particular policy conversation held long ago would usually, under the normal summary judgment standards, be sufficient. In short, if these standards are those to be followed in these cases, trial judges will almost automatically have to send such cases to full trials on the merits.

The effect of this development upon the willingness of individuals to serve their country is obvious. Not only are the personal funds of such officials placed at hazard but many of these cases are political in character, involve highly controversial acts, and will necessarily embroil juries in passing upon the intricacies of executive decisionmaking.

---

**150.** *Halperin v. Kissinger, supra* note 4, 424 F.Supp. at 846.

**151.** For standards for summary judgment, *see* note 85 *supra.*

**152.** *See text at note 8 supra.*

**153.** That is, from May 1969 until May 1970. *See text at notes 39–40 supra.*

**154.** *See* text at notes 24–27 *supra.*

In order to give the immunity doctrine some genuine force and effect, it appears to me that a plaintiff should be required to make a stronger showing than the Court's opinion requires on the immunity question before being permitted to proceed to trial. I would hold that the plaintiff must establish after the completion of discovery and before the trial commences, not merely the existence of a genuine dispute as to some material issue of fact but also, by the preponderance of the evidence or through clear and convincing evidence, that the official failed to act with subjective or objective good faith.

The problems involved in this area are particularly acute when one considers whether or not a President of the United States should be forced to go to trial and risk being held personally liable in damages where a private individual citizen claims injury as a result of acts taken by the President within the outer perimeters of his duties. Even accepting the view that the absolute immunity defense does not automatically protect a President, but only attaches to those who perform judicial and prosecutorial functions, certainly a rule should be developed which affords more deference to the Office of the President. Our constitutional traditions and decisions such as *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), strongly suggest that in view of a President's grave, complex and unique responsibilities he should receive substantial protection while in office and thereafter from individual damage suits which necessarily intrude into his mental processes and his day-to-day relations and communications with his most intimate advisors.

In short, I urge a more exacting standard be placed on the showing a plaintiff must make before proceeding to trial in the face of a properly presented qualified immunity claim.